**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SARA WEXLER, on behalf of herself and all others similarly situated, )<br><br>Plaintiffs, )<br><br>v. )<br><br>UNITED AIR LINES, INC., et al. )<br> )<br>Defendants. )<br> ) | CASE NUMBER   1:06CV01917<br><br>JUDGE: Gladys Kessler<br><br>DECK TYPE: Contract<br><br>DATE STAMP: 11/09/2006 |

## NOTICE OF REMOVAL

Defendants, United Air Lines, Inc. ("United") and UAL Corporation (collectively referred to as "UAL"), by and through their undersigned counsel, hereby file this Notice of Removal pursuant to 28 U.S.C. §§ 1331, 1332, 1441, 1446 and 1453 and state as follows:

1.      On October 20, 2006, named plaintiff Sara Wexler ("Wexler") commenced this purported nationwide class action against UAL in the Superior Court of the District of Columbia, Civil Action No. 0007789-06 ("Civil Action No. 0007789-06").  UAL was served with the Complaint and Summons on that same day.  In her Complaint, Wexler asserts, on behalf of herself and the nationwide class, that UAL engaged in deceptive practices with respect to its fares, contracts of carriage, ticketing, marketing and reservation terms and conditions related to commercial passenger airline services.

2.      UAL files this Notice of Removal within thirty (30) days of its receipt of the Complaint served on October 20, 2006, which was the first pleading served that set forth the claims that are subject to removal.  Therefore, this Notice of Removal is timely pursuant to 28 U.S.C. § 1446(b).  In accordance with 28 U.S.C. § 1446(a), attached hereto as Exhibit 1 and

made a part hereof is a copy of all process, pleadings, papers and orders served upon UAL in Civil Action No. 0007789-06.

## I.    THE COMPLAINT

A.    Causes of Action and Relief Sought

3.    According to Wexler, UAL negligently, fraudulently and falsely applies a cancellation policy that cancels remaining leg(s) of a reserved, nonrefundable flight when a passenger skips the first leg of the flight. Wexler asserts that this cancellation policy is part of an "extensive marketing scheme" that has had a "broad impact" on airline passengers. (Complaint attached at Exhibit 1, ¶ 23 ("Compl.")). To remedy this alleged wrongdoing, Wexler seeks to certify a nationwide consumer class action and asserts claims against UAL for: (1) violation of the District of Columbia Consumer Protection Procedures Act ("DCPA") (Compl., ¶¶ 20-29); (2) fraud (id., ¶¶ 30-34); (3) negligent misrepresentation (id., ¶¶ 35-38); (4) breach of contract (id., ¶¶ 39-42); and (5) unjust enrichment (id., ¶¶ 43-48).

4.    According to Wexler, her individual claims are based on her June 19, 2006, purchase of a $283.09 nonrefundable fare on the Orbitz web site to fly a round trip on UAL departing from Washington D.C. and arriving in Chicago on July 21, 2006, and returning on July 23, 2006. Prior to her schedule departure time on July 21, 2006, Wexler decided to skip the first leg of her flight without cancelling her ticketed flight or otherwise notifying UAL to reschedule. Her failure to occupy her reserved space and to timely check-in for the first leg of her flight led to the cancellation of her entire reservation and itinerary. Wexler alleges that she was forced to purchase a second full fare ticket for $917 at the airport because her reservation and itinerary were cancelled and her original nonrefundable ticket had no value. (Id., ¶¶ 15-19).

2

5.    Relying on these causes of action, Wexler alleges, on behalf of her and the class, that they are entitled to the following broad and expansive relief:

- Compensatory damages (Compl., ¶5 and Wherefore Clause ("Wherefore Clause") (iii) at p. 9);

- Disgorgement (id., ¶¶ 28(e), 46-48 and Wherefore Clause (iii));

- Punitive damages (id., ¶¶ 5, 28(c) and Wherefore Clause (v));

- Statutory damages pursuant to the DCPA, including trebled damages or a minimum of $1500 per passenger per violation (id., ¶ 28(a));

- Attorneys' fees pursuant to the DCPA (id., ¶¶ 5, 28(b) and Wherefore Clause (vi));

- Injunctive relief (id., ¶¶ 5, 28(d), Wherefore Clause (iv));

- Declaratory relief (id., ¶ 5 and Wherefore Clause (ii)); and

- Any further and just relief the Court deems necessary (Id., ¶¶ 28(f), and Wherefore Clause (vii)).

Wexler describes the class injury and damages as "substantial" and she seeks disgorgement of "substantial fares" UAL allegedly improperly collected.  (Id., ¶ 22 and Wherefore Clause (ii)). Specifically, Wexler demands return of all money collected and kept by UAL as a result of the challenged cancellation policy.  These damages as alleged likely include: (a) a proportionate return of a fare attributable to cancelled leg(s); (b) a return of amounts paid to UAL for a second ticket acquired out of necessity after a cancellation of a prior ticket; and (c) other damages related to the cancellation (e.g., overnight hotel accommodations).  (Id., Wherefore Clause).

B.    The Proposed Class

6.    The proposed class is nationwide and includes every single passenger on UAL over a three (3) year period commencing October 19, 2003 through the present who made

3

reservations and paid for a nonrefundable round trip flight on UAL, skipped flying the first leg, and had the remaining or return leg(s) cancelled. (Id., ¶ 9).

7.    According to Wexler, the class size "numbers thousands of people." (Id., ¶ 10) (emphasis added).  Indeed, Wexler notes that UAL has more than 1600 mainline flights a day. (Id., ¶ 6).  This number is taken from UAL's Annual Form 10-K for the year ended December 31, 2005 (an excerpted portion is attached as Exhibit 2).  For the one year period ending December 31, 2004, UAL operated approximately 1500 mainline flights a day.  See 2004 UAL Annual Form 10-K (an excerpted portion is attached as Exhibit 3).  And for the one year period ending December 31, 2003, UAL operated approximately 1600 mainline flights per day.  See 2003 UAL Annual Form 10-K (an excerpted portion is attached as Exhibit 4).[1]  Over a 3 year period, UAL flew approximately 1,715,500 flights.[2]  UAL flew approximately 67 million mainline revenue passengers in 2005; approximately 71 million mainline revenue passengers in 2004; and approximately 66 mainline revenue passengers in 2003.  (See Exs. 2-4).

---

[1]    Excerpts are attached because the reports are lengthy and attaching the complete copies would be cumbersome and unnecessary.  The complete annual reports are publicly filed and can be found at the "Investor Relations" section of UAL's website located at www.united.com.  For purposes of this Notice of Removal only, UAL asks that the Court take judicial notice of these annual reports, just as Wexler does in paragraph 6 of the Complaint.

[2]    This assumption may be conservative.  UAL has contractual marketing relationships with United Express flights, but does not operate those flights.  Including those flights there are more than 3600 flights per day.  Wexler is unclear as to whether she intends for passengers on United Express flights to

*(footnote continued to next page)*

## II.    REMOVAL

A.    <u>Removal Is Proper Based On Diversity Jurisdiction Pursuant to 28 U.S.C. § 1332(a).</u>

8.    This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332 <u>et seq.</u> because the parties' citizenship is diverse and the amount in controversy exceeds $75,000 exclusive of costs and interest.

9.    Wexler is a citizen of the District of Columbia. (Compl., ¶ 8).

10.    Defendant UAL Corporation is incorporated under the laws of Delaware with a principal place of business in Illinois. (<u>Id.</u>, ¶ 7). Defendant United Air Lines, Inc. also is incorporated under the laws of Delaware with a principal place of business in Illinois. (<u>Id.</u>, ¶ 6). Thus, as alleged, there is complete diversity, because both defendants reside in states different than the named plaintiff, Wexler.

11.    The $75,000 amount-in-controversy requirement (exclusive of interest and costs) also is satisfied. Though damages are unspecified in Wexler's Complaint, she demands the following relief:

- <u>Disgorgement</u>: Wexler seeks return of the $917 she paid for the second ticket.

- <u>Punitive Damages</u>: Wexler also seeks punitive damages. Pursuant to <u>State Farm Mut. Auto Ins. Co. v. Campbell</u>, 538 U.S. 408, 416-17 (2003), if Wexler was successful in her claim for punitive damages she would usually receive a single-digit multiplier rarely exceeding 10 times. Thus, punitive damages on the disgorged amount for Wexler's second ticket, in the absence of any extraordinary circumstances, potentially are $9,170.

---

*(footnote continued from previous page)*

be considered part of the class, although UAL notes that Wexler references the 3600 flights a day in her Complaint. (Compl., ¶ 6).

- <u>Treble Damages</u>: Pursuant to the DCPA § 28-3905(k)(1), Wexler seeks the greater of treble damages or a minimum of $1,500. Here, $917 trebled means $2,751 is at controversy.

- <u>Attorneys' Fees</u>: Pursuant to the DCPA, Wexler also seeks attorneys' fees incurred in prosecuting Wexler's individual claims. UAL also notes that Wexler seeks a jury trial on all counts of the Complaint. The attorneys' fees alone satisfy the $75,000 amount-in-controversy threshold.

  Wexler has four (4) lawyers representing her. Two New York partners (Attorneys Peter Morgenstern and Eric Fisher), a New York associate (Attorney Laura Lefkowitz), and a D.C. partner (Attorney Nat Polito). By her own admission, Wexler's counsel is "experienced." (Compl., ¶ 11). According to their publicly available bios, Wexler's attorneys have 24 years, 11 years, 4 years and 11 years of experience, respectively.

  Wexler's New York attorneys filed a fee petition in a separate action on October 24, 2006 (4 days after the filing of the Complaint).[3] In that pleading, their effective billing rates as of August 1, 2006 were $720 for Morgenstern, $540 for Fisher, and $350 for Lefkowitz. Morgenstern, the senior partner, worked more billable hours on that particular matter than did Fisher or Lefkowitz. Polito's hourly rate is estimated at $450 per hour.[4] The rates and billable hours produce an average blended billing rate of $515 per lawyer. Although UAL reserves the right to challenge the reasonableness of any such fee petition by Wexler's lawyers, it is likely that Wexler's attorneys will each claim to have worked 60 to 75 hours on the matter. Thus, Wexler's attorneys will likely seek fees for prosecuting her individual claims in this matter in the range of $123,600 to $154,500 ($515 per hour multiplied by 60 to 75 hours).[5]

- Wexler also seeks injunctive relief prohibiting enforcement of the cancellation policy. This relief would force UAL to incur considerable expense in revising its nonrefundable fares, contract of carriage and

---

[3]    The Fee Petition was the "First Interim Application of Morgenstern, Jacobs & Blue, LLC, Counsel to the Official Committee of Equity Security Holders, for an Allowance of Compensation and Reimbursement of Expense Pursuant to 11 U.S.C. §§ 330, 331, 1102 and 1103" and was filed in the United States Bankruptcy Court Southern District of New York. A copy of this publicly filed pleading is attached hereto as Exhibit 5 and the rates are published at Exhibit B.

[4]    Nat Polito, Wexler's D.C. attorney's billable rates are not available. A conservative estimate of the rates in D.C. for someone with 11 years experience is $450.

[5]    Even a blended billing rate of Wexler's attorneys reduced by a 1/3 to $350 per hour leads to a calculation of fees of anywhere from $84,000 to $105,000.

CHGO1\30863217.2

summary of contract of carriage; changing its web site, computers and/or reservation systems; printing numerous copies of the new contracts of carriage and placing them at all the numerous locations mandated by the DOT; and notifying each of our vendors of these changes and ensuring that they are implemented. It is certain that the requested injunctive relief alone would force UAL to incur in excess of $75,000.

The amount-in-controversy for the named plaintiff, Wexler, more than satisfies the amount-in-controversy requirement. Accordingly, removal is proper pursuant to 28 U.S.C. § 1332(a) et seq. See Angus v. Shiley Inc., 989 F.2d 142, 145 (3d Cir. 1993) ("The general federal rule is to decide the amount in controversy from the complaint itself."); Ballard v. Corinthian Colleges, Inc., No. C06-5256 FDB, 2006 WL 1806190 (W.D. Wash. June 28, 2006) (stating that the amount in controversy is based on "the damages that can reasonably be anticipated").

B.    Removal Is Proper Pursuant to 28 U.S.C. § 1332(d) Et Seq.

12.    In 2005, the Class Action Fairness Act ("CAFA") created an independent basis for conferring federal courts with jurisdiction over state class actions. Specifically, CAFA applies if: (a) the class size is more than 100 potential class members; (b) minimal diversity exists; and (c) the claims of all class members if aggregated satisfy a $5 million amount-in-controversy requirement (exclusive of interest and costs). See 28 U.S.C. § 1332(d) et seq. The allegations in the Complaint sufficiently demonstrate that jurisdiction is proper under CAFA. Chain Drug, Inc. v. Aetna U.S. Healthcare, Inc., No. 2:05-CV-292-MEF, 2006 WL 1134070 (M.D. Ala. Apr. 14, 2006) (it is proper for a court to determine jurisdiction under CAFA based on the allegations in a complaint).

13.    As demonstrated above, the first two requirements of CAFA have been met. More than minimal diversity, complete diversity exists between the parties, and the class size according to Wexler numbers in the "thousands". (See Compl., ¶ 10.)

14.    This class action also satisfies the $5 million amount-in-controversy requirement. Although class damages are unspecified in Wexler's Complaint, the $5 million threshold is satisfied based on the following factors:

- The class period spans 3 years from October 19, 2003 through the present. (Compl., ¶ 9).

- On behalf of the class, Wexler seeks: (a) "compensatory and punitive damages, costs, attorneys' fees, declaratory relief, and an injunction . . ." (id., ¶ 5); (b) treble damages or a minimum of $1,500 (whichever is greater) pursuant to the DCPA § 28-3905(k)(1) (id., ¶ 28); (c) disgorgement plus interest (id., ¶ 48); and (d) declaratory relief (id., Wherefore Clause (ii)).

- Wexler alleges that her claims for damages, including the $917 she paid for a second ticket is "typical" of class members. (Id., ¶ 11).

- Calculation:  As demonstrated above, $917 trebled equals $2,751 per person in damages under the DCPA.[6] Even conservatively assuming that the "thousands" of class members Wexler alleges are part of the class only numbered 2,000 members, $5,502,000 is the amount-in-controversy-- (2000 x $2,751 = $5,502,000).

- This calculation does not include any punitive damages, which as discussed above, can be up to 10 times compensatory damages absent extraordinary circumstances.[7]

- This calculation does not include attorneys' fees likely to be claimed by Wexler's attorneys.  The attorneys' fees likely claimed by Wexler's attorneys in Section III above is inapplicable here because their claimed attorneys' fees for pursing a class action instead of an individual action will be larger.  For example, Wexler's attorneys will seek fees for pursuing class discovery, briefing class certification and providing notice to the class members.  (See n.7).

---

[6]    At a minimum, Wexler alleges that under the DCPA, each one of the thousands of class members is entitled to statutory damages of $1,500 for each alleged violation.  (See Compl., ¶ 28.).

[7]    UAL reserves the right to provide the Court additional information on these amounts for the calculation of the $5 million threshold, if the Court deems it necessary.

- This calculation does not include the value of injunctive/declaratory relief detailed above in Section III. (See n.7).

All of these damages properly included lead to the conclusion that the CAFA amount-in-controversy threshold of $5 million is satisfied by this purported class action. Accordingly, jurisdiction in this Court is proper.

C.    Removal Is Proper Based On Federal Question Jurisdiction Pursuant to 28 U.S.C. § 1331.

15.    Federal question jurisdiction is also available. At the heart of Wexler's Complaint is the notion that the class was not properly notified of fare restrictions, cancellations policies and penalties associated with nonrefundable tickets. These items were addressed in United's Contract of Carriage and fares terms and conditions. Pursuant to 14 CFR § 253 et seq., notice, adequate disclosure of terms of a Contract of Carriage and incorporated terms and availability are subject to determination by the Department of Transportation under its regulations. For this reason, Wexler's Complaint concerns compliance with federal regulations and, thereby confers federal question jurisdiction on this Court. 28 U.S.C. § 1331; see D'Alessio v. N.Y. Stock Exch., 258 F.3d 93, 101-02 (S.D.N.Y. 2001) (finding federal question jurisdiction where the plaintiff's claims required the court to construe federal law and evaluate the defendant's duties under federal regulations).

### III.    CONCLUSION

16.    For all of these independent grounds, this lawsuit properly is removed to this Court.

17.    No admission of fact, law or liability is intended by this Notice of Removal and all defenses, motions and pleadings are expressly reserved.

CHGO1\30863217.2

18.   This Notice of Removal is served upon all parties and filed with the Clerk of the Superior Court of the District of Columbia, Civil Action No. 0007789-06, contemporaneously with this filing.  See 28 U.S.C. § 1446(d).

**WHEREFORE**, for all of the reasons contained herein and in the Statement of Removal, Defendants United Air Lines, Inc. and UAL Corporation pray that the above-referenced action now pending in the Superior Court of the District of Columbia, Civil Action No. 0007789-06, be removed in its entirety to this Court and, pursuant to 28 U.S.C. § 1446(d), that the Superior Court proceed no further.

Respectfully submitted,

Edward S. Scheideman (D.C. Bar No. 475128)
DLA PIPER US LLP
1200 Nineteenth Street, N.W.
Washington, D.C.  20036-2412
(202) 861-3900
(202) 223-2085 (fax)

Counsel for Defendants United Air Lines, Inc.
and UAL Corporation

Of Counsel:

Lawrence A. Wojcik (not yet admitted pro hac vice)
Raj N. Shah (not yet admitted pro hac vice)
DLA Piper US LLP
203 North LaSalle Street
Suite 1900
Chicago, Illinois 60601-1293
(312) 368-4000
(312) 236- 7516 (fax)

10

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SARA WEXLER, on behalf of herself and all others similarly situated, ) ) ) ) | |
| Plaintiffs, ) ) | Case No. _____ |
| v. ) ) | |
| UNITED AIR LINES, INC., et al. ) ) | |
| Defendants. ) ) | |

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on November 9, 2006, a copy of the foregoing Defendants'

Notice of Removal was served via first-class mail, postage prepaid to:

> Nat N. Polito, Esq.
> Law Offices of Nat N. Polito, PC
> 1776 K Street, N.W.
> Suite 200
> Washington, D.C. 20006

_____
Edward S. Scheideman

# Exhibit 1

**united.csc**

0607-3495

| | |
|---|---|
| **From:** | sop@cscinfo.com |
| **Sent:** | Friday, October 20, 2006 3:41 PM |
| **To:** | united.csc |
| **Subject:** | Notice of Service of Process |

C. TEDIO

OCT 2 3 2006

WHQLD

# Corporation Service Company ®

*CSC SameDay SOP and CSC PowerBrief clients, click here to receive and view your Service of Process documents now.*
*For more information on instant access to your SOP, click Sign Me Up.*

**NOTICE OF SERVICE OF PROCESS**

Transmittal Number: 4845999
Date: 10/20/2006

Pursuant to client instructions, we are forwarding this summary and notice of Service of Process. The Service of Process document has been sent to the primary contact listed below.

| | |
|---|---|
| **Entity:** | United Air Lines, Inc. |
| **Entity I.D. Number:** | 0115287 |
| **Entity Served:** | United Airlines, Inc. |
| **Title of Action:** | Sara Wexler vs. United Airlines, Inc. |
| **Document(s) type:** | Summons/Complaint |
| **Nature of Action:** | Other |
| **Court:** | Superior Court-Civil Division, District Of Columbia |
| **Case Number:** | 0007789-06 |
| **Jurisdiction Served:** | District Of Columbia |
| **Date Served on CSC:** | 10/20/2006 |
| **Answer or Appearance Due:** | 20 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |

**Plaintiff's Attorney:**
Nat N. Polito
202-463-0110

**Primary Contact:**
Cheryl Tedio - WHQLD
UAL Corporation (United Airlines)

10/23/2006

CA Form 1

# Superior Court of the District of Columbia
CIVIL DIVISION
500 Indiana Avenue, N.W., Room JM-170
Washington, D.C. 20001 Telephone: 879-1133

Sarah Wexler, on behalf
of herself and all others similarly
situated

*Plaintiff*

vs.

0007789-06

Civil Action No. _____

United Airlines, Inc., et al
Serve:
    Prentice-Hall Corporation System, Inc.
    1090 Vermont Avenue, NW
    Washington, DC 20005

*Defendant*

SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Room JM 170 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Nat N. Polito
Name of Plaintiff's Attorney

1776 K Street, NW, #200
Address
Washington, D.C. 20006

202-463-0110
Telephone

Clerk of the Court

By _____
Deputy Clerk

Date _____

PUEDE OBTENERSE COPIAS DE ESTE FORMULARIO EN ESPANOL EN EL TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA, 500 INDIANA AVENUE, N.W., SALA JM 170

YOU MAY OBTAIN A COPY OF THIS FORM IN SPANISH AT THE SUPERIOR COURT OF D.C., 500 INDIANA AVENUE, N.W., ROOM JM 170

NOTE: SEE IMPORTANT INFORMATION ON BACK OF THIS FORM.

CV(6)-456(Rev.May)83

IMPORTANT:  IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (624-1161) or the Neighborhood Legal Services (682-2700) for help or come to Room JM 170 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

SARA WEXLER, on behalf of herself and all       )
others similarly situated,                       )
1234 Massachusetts Avenue NW                     )
Washington, DC 20005                             )
                                                 )      Case No. 0007789-06
                                                 )
                          Plaintiffs,            )
                                                 )
            – v –                                )
                                                 )
                                                 )
UNITED AIR LINES, INC., a Delaware               )
Corporation,                                     )
                                                 )      ┌─────────────────────┐
Serve:  Prentice-Hall Corporation System, Inc.   )      │    RECEIVED         │
        1090 Vermont Avenue, N.W.                )      │  Civil Clerk's Office│
        Washington, D.C. 20005                   )      │                     │
                                                 )      │   OCT 2 0 2006      │
And                                              )      │  Superior Court of the│
                                                 )      │  District of Columbia │
UAL CORPORATION, a Delaware                      )      │   Washington, D.C.  │
Corporation,                                     )      └─────────────────────┘
                                                 )
Serve:  Prentice-Hall Corporation System, Inc.   )
        1090 Vermont Avenue, N.W.                )
        Washington, D.C. 20005                   )
                                                 )
                                                 )
                          Defendants.            )

---

## CLASS ACTION COMPLAINT

Plaintiff Sara Wexler ("Plaintiff"), on behalf of herself and all others similarly

situated, by her attorneys, as and for her Class Action Complaint against Defendants

United Air Lines, Inc. ("United") and UAL Corporation ("UAL," collectively referred to

as "Defendants"), alleges as follows:

## JURISDICTION AND VENUE

1.    Jurisdiction of this Court is founded on D.C. Code § 11-921.

2.    Defendants are subject to personal jurisdiction in the District of Columbia because they are present in the District and do business here.

3.    Venue is proper in the District of Columbia because one or more of the parties resides in the District of Columbia.

## BACKGROUND

4.    This is a consumer class action seeking damages, injunctive and declaratory relief against Defendants for false and deceptive practices in failing to disclose, at the time a flight reservation is made, that United automatically cancels a return flight if a passenger fails to use the initial leg of a reserved round trip ticket, and that no refund will issue for either leg of the flight (the "Cancellation Policy").

5.    Defendants conduct violates the District of Columbia Consumer Protection Procedures Act, and also constitutes fraud, negligence and breach of contract. Plaintiff therefore seeks, on behalf of herself and all others similarly situated, compensatory and punitive damages, costs, attorneys' fees, declaratory relief and an injunction against United and UAL barring them from continuing false and deceptive trade practices in connection with the Cancellation Policy.

## PARTIES

6.    Upon information and belief, United is a Delaware corporation with a principal place of business located at 1200 East Algonquin Road, Elk Grove Township, Illinois, 60007. United is one of the largest passenger airlines in the world with more than 3,600 flights a day to more than 200 destinations through its mainline and United Express services. United offers 1,600 average daily mainline departures to more than 120 destinations in 28 countries and two U.S. territories. United does business in the District of Columbia and, at present, operates regularly at Ronald Reagan Washington National Airport.

7.     Upon information and belief, UAL is a Delaware corporation with a principal place of business located at 1200 East Algonquin Road, Elk Grove Township, Illinois, 60007.   UAL is a holding company whose principal subsidiary is United. United's operations, which consist primarily of the transportation of persons, property, and mail throughout the U.S. and abroad, account for most of UAL's revenues.

8.     Plaintiff Sara Wexler is a resident of the District of Columbia, who, as set forth below, directly and proximately suffered losses as a result of Defendants' undisclosed Cancellation Policy.

## CLASS ACTION ALLEGATIONS

9.     Pursuant to Rule 23(b)(1), (2), and (3) of the District of Columbia Rules of Court, Plaintiff brings this complaint on behalf of a class (the "Class") comprised of all persons and entities who, at any time on or after October 19, 2003: (a) made reservations and paid in full for round trip flights on United; (b) were unable to fly on the initial leg of the round trip itinerary; and (c) had their return flight cancelled.  The Class excludes Defendants and their officers, executives, subsidiaries and affiliates; the officers and executives of Defendants' subsidiaries and affiliates; and any federal, state or local government purchasers.

10.     Upon information and belief, the Class numbers thousands of people and is so numerous that joinder of all members is impracticable.

11.     Plaintiff's claims are typical of the members of the Class and Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff has no conflict with any other members of the Class and has retained competent and experienced counsel to prosecute this case.

12.     Common questions of law and fact predominate over any questions affecting only individual class members. Common questions of law and fact include:

- whether Defendants engaged in the deceptive acts alleged herein;

- whether Defendants injured Plaintiff and the members of the Class;

3

- whether an injunction should issue prohibiting Defendants from engaging in deceptive acts in connection with the Cancellation Policy; and

- the appropriate measure of damages.

13.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## DEFENDANTS' FRAUDULENT CONCEALMENT OF CANCELLATION POLICY

14.     Defendants falsely and fraudulently concealed the Cancellation Policy from consumers at the time that consumers booked reservations, and subsequently misrepresented the Cancellation Policy.

15.     On or about June 19, 2006, Plaintiff reserved and paid $283.09 for a round trip airline ticket on Orbitz.com. Plaintiff was scheduled to depart from Washington Dulles International Airport, located in Dulles, Virginia, and arrive in Chicago, Illinois, on United Flight No. 631 on July 21, 2006, and return to Washington, DC on United Flight No. 7287 on July 23, 2006. Neither the United website, nor Orbitz.com, indicated that United would cancel the entire itinerary, without refund to the passenger, should the passenger fail to use the ticket for the first leg of the round trip.

16.     Unexpectedly, Plaintiff learned that an obligation would take her out of Washington, DC on July 21, 2006. Plaintiff found alternative transport to Chicago; however, she maintained her reservation with United so that she could utilize the return flight to Washington, DC on July 23, 2006.

17.     On July 23, 2006, Plaintiff attempted to check in for her flight from Chicago to Washington, DC on the United website. At that time, the website indicated to Plaintiff that United did in fact have her reservation, but that she was unable to check in online. Based on that representation, Plaintiff proceeded to Midway Airport where she

4

was then informed by a ticketing agent, for the first time, of United's undisclosed Cancellation Policy.

18.     The ticketing agent proceeded to inform Plaintiff that her coach-class ticket had been resold and that she was not entitled to any refund from her initial round trip purchase. Moreover, the agent informed Plaintiff that the only empty seats on the flight were in first class, and cost approximately $917.00. Given that Plaintiff had only one hour until her United flight was scheduled to depart, and had no knowledge of availability on other airline carriers, she purchased the first class ticket.

19.     Plaintiff paid for all of her reservations in their entirety, including the additional $917.00 first class ticket.

## COUNT I:

### VIOLATION OF
### THE D.C. CONSUMER PROTECTION PROCEDURES ACT

20.     Plaintiff repeats the allegations of paragraphs 1 through 19 as if fully set forth herein.

21.     During the Class Period, Defendants engaged in the following acts, which were materially false and deceptive:

- falsely and fraudulently failed to disclose the Cancellation Policy on their internet website or elsewhere;

- falsely and fraudulently concealed the Cancellation Policy from consumers;

- negligently failed to disclose the Cancellation Policy on their internet website or elsewhere; and

- negligently concealed the Cancellation Policy from consumers.

22.     By reason of the foregoing, Defendants have collected substantial fares through unfair and deceptive practices, and have engaged in false advertising.

5

23.    Defendants' acts described herein were directed at consumers and involved an extensive marketing scheme that had a broad impact on consumers at large.

24.    Defendants' acts described herein were materially deceptive and misled reasonable consumers acting reasonably under the circumstances.

25.    Plaintiff and other members of the Class were injured by Defendants' materially misleading and/or deceptive acts and practices, because they were subject to an undisclosed Cancellation Policy.

26.    By the acts and omissions set forth above, Defendants violated the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3904(e), in that Defendants misrepresented material facts which had a tendency to mislead.

27.    By the acts and omissions set forth above, Defendants violated the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3904(f), in that Defendants failed to state material facts and such failure had a tendency to mislead.

28.    By virtue of the foregoing, Plaintiff, on behalf of herself and the Class, is entitled under District of Columbia Consumer Protection Procedures Act, D.C. Code §28-3905(k)(1), to:

    (a)    treble damages or $1,500 for each violation, whichever is greater;

    (b)    reasonable attorneys' fees;

    (c)    punitive damages;

    (d)    an injunction against Defendants' imposition of the undisclosed Cancellation Policy;

    (e)    additional relief as may be necessary to return the Plaintiff and the class members' money which was acquired by the Defendants by their unlawful trade practices; and

    (f)    such other relief as the Court deems just and proper.

29.    Plaintiff and the Class were damaged in an amount to be determined at trial.

## COUNT II:

### FRAUD

30.     Plaintiff repeats the allegations of paragraphs 1 through 29 as if fully set forth herein.

31.     Upon information and belief, Defendants knowingly, and with the intent to deceive Plaintiff and members of the class, concealed their Cancellation Policy.

32.     United's concealment of the Cancellation Policy was material to the transaction between United on the one hand, and the Plaintiff and members of the class on the other.

33.     Plaintiff and members of the class relied to their detriment upon Defendants' misrepresentations and omissions.

34.     By reason of the foregoing, Plaintiff and the Class were damaged in an amount to be determined at trial.

## COUNT III:

### NEGLIGENT MISREPRESENTATION

35.     Plaintiff repeats the allegations of paragraphs 1 through 34 as if fully set forth herein.

36.     Defendants owed Plaintiff and members of the class a duty of care to disclose in a timely manner their Cancellation Policy.

37.     The Defendants breached their duty owed to the Plaintiff and members of the class by failing to disclose in a timely manner the Cancellation Policy.

38.     As a direct and proximate result of Defendants' breach of duty, Plaintiff and members of the class were damaged in an amount to be determined at trial.

7

## COUNT IV:

### BREACH OF CONTRACT

39.    Plaintiff repeats the allegations of paragraphs 1 through 38 as if fully set forth herein.

40.    During the Class Period, Defendants contracted to provide airplane flights and services to Plaintiff and the Class.

41.    By imposing an undisclosed Cancellation Policy, which effectively eliminated paying passengers' flights without any notice thereof, Defendants breached said contracts to Plaintiff and members of the Class.

42.    As a result of Defendants' breach, Plaintiff and the Class were damaged in an amount to be determined at trial.

## COUNT V:

### QUASI-CONTRACT/UNJUST ENRICHMENT

43.    Plaintiff repeats the allegations of paragraphs 1 through 42 as if fully set forth herein.

44.    Upon information and belief, Defendants have benefited by retaining monies received as a result of the fraudulent and otherwise negligent failure to disclose in a timely manner the Cancellation Policy to their customers.

45.    The Defendants were aware of the benefits conferred upon them.

46.    The Defendants have unjustly retained the benefit of the monies paid by Plaintiff and members of the class. Conversely, Plaintiff and members of the class have lost the benefit of the monies that they paid to the Defendants.

47.    It would be unjust and inequitable for Defendants to be allowed to retain the benefits derived from the Cancellation Policy.

8

48.    Defendants should be required to return any and all monies that they received as a result of the Cancellation Policy, plus interest, to the Plaintiff and members of the class.

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

(i.)    certifying this case to proceed as a Class Action;

(ii.)    declaring that the Defendants' false, misleading, and deceptive practices caused substantial injury and damages to Plaintiff and the Class in an amount to be determined at trial;

(iii.)    entering judgment in favor of Plaintiff and members of the class for damages in an amount to be determined at trial, such damages to include any and all sums that Defendants received as a result of the Cancellation Policy, including pre and post-judgment interest;

(iv.)    permanently enjoining Defendants from continuing to engage in the unlawful conduct described herein;

(v.)    awarding Plaintiffs and the Class punitive damages in an amount to be determined at trial;

(vi.)    granting Plaintiff and the Class the costs of suit, interest and reasonable attorneys' fees; and

(vii.)    granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all counts.

9

Dated: October 20, 2006

LAW OFFICES OF NAT N. POLITO, PC

By: _____

Nat. N. Polito (453365)
1776 K Street, NW, Suite 200
Washington, DC 20006-2333
(202) 463-0110 (voice)
(202) 463-0116 (facsimile)

MORGENSTERN JACOBS & BLUE, LLC
Peter D. Morgenstern *(not yet admitted Pro Hac Vice)*
Eric B. Fisher *(not yet admitted Pro Hac Vice)*
Laura J. Lefkowitz *(not yet admitted Pro Hac Vice)*
885 Third Avenue
New York, New York 10022
(212) 750-6776
*Of Counsel*

10



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

SARA WEXLER
Vs.                                                    C.A. No.        2006 CA 007789 B
UNITED AIRLINES, INC.

## INITIAL ORDER

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure
("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings
in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On
filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the
original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant:
copies of the Summons, the Complaint, and this Initial Order, and any General Order issued **by the judge** to
whom the case is assigned. As to any defendant for whom such proof of service has not been filed, the
Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant
has been extended as provided in SCR Civ 4(o).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant
must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has
failed to respond, a default and judgment will be entered unless the time to respond has been extended as
provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the
assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and
to establish a schedule for the completion of all proceedings, including, normally, either mediation, case
evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are
agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will
receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review
Branch (202) 879-1750 may continue the Conference once, with the consent of all parties, to either of the two
succeeding Fridays. Request must be made not less than six business days before the scheduling conference date.
No other continuance of the conference will be granted except upon motion for good cause shown.

Chief Judge Rufus G. King, III

Case Assigned to: Judge MELVIN R. WRIGHT
Date:   October 20, 2006
Initial Conference: 9:30 am, Friday, January 19, 2007
Location:  Courtroom 200
             500 Indiana Avenue N.W.
             WASHINGTON, DC  20001

Caio.doc

# Exhibit 2



# FORM 10-K

## UAL CORP /DE/ - UAUA

**Filed: March 31, 2006 (period: December 31, 2005)**

Annual report which provides a comprehensive overview of the company for the past year

# Table of Contents

<u>PART I</u>

<u>Item 1.</u>        <u>Business 3</u>

<u>PART I</u>

<u>ITEM 1.</u>        <u>BUSINESS.</u>
<u>ITEM 1A.</u>      <u>RISK FACTORS.</u>
<u>ITEM 1B.</u>      <u>UNRESOLVED STAFF COMMENTS.</u>
<u>ITEM 2.</u>        <u>PROPERTIES.</u>
<u>ITEM 3.</u>        <u>LEGAL PROCEEDINGS.</u>
<u>ITEM 4.</u>        <u>SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS.</u>

<u>PART II</u>

<u>ITEM 5.</u>        <u>MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER</u>
<u>ITEM 6.</u>        <u>SELECTED FINANCIAL DATA.</u>
<u>ITEM 7.</u>        <u>MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND</u>
<u>ITEM 7A.</u>      <u>QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK</u>
<u>ITEM 8.</u>        <u>FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA</u>
<u>Item 9.</u>        <u>CHANGES IN AND DISAGREEMENTS WITH ACCOUNTS ON ACCOUNTING AND FINANCIAL DISLCOSURE.</u>
<u>ITEM 9A.</u>      <u>CONTROLS AND PROCEDURES.</u>
<u>ITEM 9B.</u>      <u>OTHER INFORMATION.</u>
<u>ITEM 10.</u>      <u>DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT.</u>
<u>ITEM 11.</u>      <u>EXECUTIVE COMPENSATION.</u>
<u>ITEM 12.</u>      <u>SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS</u>
<u>ITEM 13.</u>      <u>CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS.</u>
<u>ITEM 14.</u>      <u>PRINCIPAL ACCOUNTANT FEES AND SERVICES.</u>

<u>PART IV</u>

<u>ITEM 15.</u>      <u>EXHIBITS, FINANCIAL STATEMENTS AND SCHEDULES.</u>
<u>SIGNATURES</u>
<u>EXHIBIT INDEX</u>
<u>EX-10.37 (Material contracts)</u>

<u>EX-10.39 (Material contracts)</u>

<u>EX-10.43 (Material contracts)</u>

<u>EX-10.44 (Material contracts)</u>

EX–12.1 (Statement regarding computation of ratios)

EX–12.2 (Statement regarding computation of ratios)

EX–21 (Subsidiaries of the registrant)

EX–23 (Consents of experts and counsel)

EX–31.1

EX–31.2

EX–32.1

EX–32.2

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 10-K

[X]    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2005

OR

[ ]    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from _____ to _____

Commission File No. 001-06033

UAL CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Delaware | 36-2675207 |
| (State or other jurisdiction of | (IRS Employer |
| incorporation or organization) | Identification No.) |

| | |
|---|---|
| Location: 1200 East Algonquin Road, Elk Grove Township, Illinois | 60007 |
| Mailing Address: P. O. Box 66919, Chicago, Illinois | 60666 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code:   (847) 700-4000

Securities registered pursuant to Section 12(b) of the Act: None

Securities registered pursuant to Section 12 (g) of the Act:

Title of Each Class

Common Stock, $.01 par value

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes[ ] No[X]

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes[ ] No[X]

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes[X]   No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [X]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act.

Large accelerated filer [ ]          Accelerated filer [X]          Non-accelerated filer [ ]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes[ ] No[X ]

The aggregate market value of voting stock held by non-affiliates of the Registrant was $184,915,925 as of June 30, 2005.

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Section 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court. Yes[X]   No [ ]

The number of shares of common stock outstanding as of March 27, 2006 was 97,406,273.

**UAL Corporation and Subsidiary Companies Report on Form 10-K**
**For the Year Ended December 31, 2005**

Page

PART I

Item 1.    Business                                                                          3

Item 1A. Risk Factors                                                                       17

Item 1B. Unresolved Staff Comments.                                                         23

Item 2.    Properties                                                                       24

Item 3.    Legal Proceedings                                                                26

Item 4.    Submission of Matters to a Vote of Security Holders                              29


PART II

Item 5.    Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity    30
           Securities

Item 6.    Selected Financial Data                                                          32

Item 7.    Management's Discussion and Analysis of Financial Condition and Results of       33
           Operations

Item 7A. Quantitative and Qualitative Disclosures about Market Risk                         53

Item 8.    Financial Statements and Supplementary Data                                      54
                                                                                           108

Item 9.    Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

Item 9A. Controls and Procedures                                                           108

Item 9B. Other Information                                                                 113


PART III

Item 10.  Directors and Executive Officers of the Registrant                               114

Item 11.  Executive Compensation                                                           122

Item 12.  Security Ownership of Certain Beneficial Owners and Management and Related Stockholder
          Matters                                                                          128

Item 13.  Certain Relationships and Related Transactions                                   138

Item 14.  Principal Accountant Fees and Services                                           139


PART IV

Item 15.  Exhibits, Financial Statements and Schedules                                     141

## PART I

### ITEM 1. BUSINESS.

UAL Corporation (together with its consolidated subsidiaries, "we," "our," "us," "UAL" or the "Company") was incorporated under the laws of the State of Delaware on December 30, 1968. World headquarters is located at 1200 East Algonquin Road, Elk Grove Township, Illinois 60007. The mailing address is P.O. Box 66919, Chicago, Illinois 60666 (telephone number (847) 700–4000).

UAL is a holding company whose principal subsidiary is United Air Lines, Inc. ("United"). United's operations, which consist primarily of the transportation of persons, property, and mail throughout the U.S. and abroad, accounted for most of UAL's revenues and expenses in 2005. United provides these services through full–sized jet aircraft (which we refer to as our "mainline" operations), as well as smaller aircraft in its regional operations conducted under contract by "United Express®ⁿ" carriers.

United is one of the largest passenger airlines in the world with more than 3,600 flights a day to more than 200 destinations through its mainline and United Express services. United offers 1,600 average daily mainline (including Ted(SM)) departures to more than 120 destinations in 28 countries and two U.S. territories. United provides regional service connecting primarily with United's domestic hubs through marketing relationships with United Express carriers, which provide more than 2,000 average daily departures to more than 150 destinations. United serves virtually every major market around the world, either directly or through its participation

**Segments.** UAL operates its businesses through five reporting segments: North America, Pacific, Atlantic, Latin America (all of which are operated by United) and UAL Loyalty Services, LLC ("ULS"). Financial information on UAL's reportable segments can be found in Note 18, "Segment Information" in the Notes to Consolidated Financial Statements.

During 2005, United carried approximately 67 million mainline revenue passengers and flew approximately 114 billion mainline revenue passenger miles ("RPMs"). United operating statistics reported in this Form 10-K (which we refer to as "mainline" operations) do not include the operations of United Express regional carriers, since these entities are independent carriers who report those operating statistics separately to the Department of Transportation ("DOT").

Operating revenues attributed to United's North America segment were $10.8 billion in 2005, $10.5 billion in 2004 and $9.9 billion in 2003. Operating revenues attributed to United's international segments were $5.6 billion in 2005, $5.1 billion in 2004 and $4.2 billion in 2003.

North America. As of December 31, 2005, United's mainline operations served 86 destinations throughout North America and operated hubs in Chicago, Denver, Los Angeles, San Francisco and Washington, D.C. In 2005, United's North America operations, including United Express, accounted for 62% of operating revenues.

Pacific. United serves the Pacific from its U.S. gateway cities of Chicago, Honolulu, Los Angeles, New York, San Francisco and Seattle. United provides nonstop service to Beijing, Hong Kong, Nagoya, Osaka, Seoul (summer seasonal), Shanghai, Sydney and Tokyo. United also provides direct service via its Tokyo hub to Bangkok, Hong Kong, Seoul, Singapore and Taipei as well as direct service via Hong Kong to Ho Chi Minh City and Singapore, and via Sydney to Melbourne. In 2005, United's Pacific operations accounted for 18% of operating revenues.

Atlantic. Washington, D.C. is United's primary gateway to Europe, serving Amsterdam, Brussels, Frankfurt, London, Munich, Zurich and Paris. Chicago is United's secondary gateway to Europe, serving Amsterdam (summer seasonal), Frankfurt, London, Munich and Paris. United also provides nonstop service between San Francisco and each of London and Frankfurt; and between London and each of Los Angeles and New York. United provides seasonal service between Chicago and Bermuda. In 2005, United's Atlantic operations accounted for 12% of operating revenues.

Latin America. United serves four points in South America from its Chicago and Washington, D.C. hubs with nonstop service to Buenos Aires and Sao Paulo and direct service to Montevideo (via Buenos Aires) and Rio de Janeiro (via Sao Paulo). United serves various Mexican and Caribbean points from its five hubs including Aruba, Cancun, Cozumel, Mexico City, Puerto Vallarta, San Jose del Cabo, Ixtapa/Zihuatanejo, Montego Bay, Nassau, Punta Cana, and St. Maarten. United serves Central America from its Los Angeles hub to Guatemala City and San Salvador and from its Chicago hub to Liberia, Costa Rica. In 2005, United's Latin America operations accounted for approximately 3% of operating revenues.

UAL Loyalty Services, LLC. ULS focuses on expanding the non-core marketing businesses of United and building customer loyalty. ULS operates substantially all United-branded travel distribution and customer loyalty e-commerce activities, such as united.com. In addition, ULS owns and operates Mileage Plus, being responsible for member relationships, communications and account management; while United is responsible for other aspects of Mileage Plus, including the Elite Premier, Premier Executive and Premier Executive 1K loyalty programs, and the establishment of award mileage redemption programs and airline-related customer loyalty recognition policies. United is also responsible for managing relationships with its Mileage Plus airline partners, while ULS manages relationships with non-airline business partners, such as the Mileage Plus Visa Card, hotels, car rental companies and dining programs, among others. ULS accounted for 5% of 2005 operating revenues.

In 2005, the Bankruptcy Court approved a corporate restructuring that (a) moved Ameniti Travel Clubs, Inc. (formerly known as Confetti, Inc.) as a subsidiary of ULS to a subsidiary of MyPoints.com, Inc. ("MyPoints"); (b) moved MyPoints as a subsidiary of ULS to a subsidiary of UAL; (c) moved ULS as a subsidiary of UAL to a subsidiary of United; and (d) converted ULS from a corporation to a limited liability company. This restructuring was completed on March 21, 2005. For additional information, see Note 22, "UAL Loyalty Services LLC" in the Notes to Consolidated Financial Statements.

**United Express.** United has contractual relationships with various regional carriers to provide regional jet and turboprop service branded as United Express. United Express is a seamless extension of the United product line (United, Ted and p.s.). SkyWest Airlines, Mesa Airlines, Chautauqua Airlines, Shuttle America, Trans States Airlines and GoJet Airlines are all United Express carriers, most of which operate under capacity purchase agreements. The terms of these agreements require United to pay the regional carriers contractually-agreed amounts for operating these flights plus a variable reimbursement based on agreed performance metrics. Under these capacity agreements, United is responsible for all fuel costs incurred. In return, the regional carriers operate this capacity on schedules determined by United, who also determines pricing, revenues and inventory levels and assumes the distribution risk for the available seats.

The capacity agreements which United has entered into with United Express carriers do not include the provision of ground handling services. As a result, United sources ground handling support from a variety of third-party providers as well as by utilizing internal United resources in some cases.

While the regional carriers operating under capacity purchase agreements comprise over 95% of United Express flying, we also have limited prorate agreements with SkyWest Airlines, Trans States Airlines and Colgan Airlines. Under these prorate agreements, United and its prorate partners agree to divide revenue collected from each passenger according to a formula, while both United and the prorate partners are individually responsible for their own costs of operations. Generally, United also collects a program fee from

# Exhibit 3



# FORM 10-K

## UAL CORP /DE/ – UALAQ

**Filed: March 16, 2005 (period: December 31, 2004)**

Annual report which provides a comprehensive overview of the company for the past year

# Table of Contents

PART I

Item 1.    Business 3

PART I

ITEM 1.    BUSINESS.
ITEM 2.    PROPERTIES.
ITEM 3.    LEGAL PROCEEDINGS.
ITEM 4.    SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS.

PART II

ITEM 5.    MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED
           STOCKHOLDER MATTERS.
ITEM 6.    SELECTED FINANCIAL DATA AND OPERATING STATISTICS.
ITEM 7.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION
           AND RESULTS OF OPERATIONS.
ITEM 7A.   QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK
ITEM 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON
           ACCOUNTING AND FINANCIAL DISCLOSURE.
ITEM 9A.   CONTROLS AND PROCEDURES.
ITEM 9B.   OTHER INFORMATION.
ITEM 10.   DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT.
ITEM 11.   EXECUTIVE COMPENSATION.
ITEM 12.   SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND
           MANAGEMENT AND RELATED STOCKHOLDER MATT
ITEM 13.   CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS.
ITEM 14.   PRINCIPAL ACCOUNTANT FEES AND SERVICES.

PART IV

ITEM 15.   EXHIBITS, FINANCIAL STATEMENTS AND SCHEDULES.
SIGNATURES
EXHIBIT INDEX
EX-4.23 (Instruments defining the rights of security holders)

EX-4.24 (Instruments defining the rights of security holders)

EX-10.43 (Material contracts)

EX-12.1 (Statement regarding computation of ratios)

EX-12.2 (Statement regarding computation of ratios)

EX–21 (Subsidiaries of the registrant)

EX–23 (Consents of experts and counsel)

EX–31.1

EX–31.2

EX–32.1

EX–32.2

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 10–K

[X]    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2004

OR

[ ]    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from _____ to_____

Commission File No. 1–6033

## UAL CORPORATION
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | 36–2675207 |
| (State or other jurisdiction of | (IRS Employer |
| incorporation or organization) | Identification No.) |

| | |
|---|---|
| **Location: 1200 East Algonquin Road, Elk Grove Township, Illinois** | 60007 |
| **Mailing Address: P. O. Box 66919, Chicago, Illinois** | 60666 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code:   (847) 700–4000

Securities registered pursuant to Section 12(b) of the Act: None

Securities registered pursuant to Section 12 (g) of the Act:

Title of Each Class

Common Stock, $.01 par value

Depositary Shares each representing
1/1000 of a share of Series B
Preferred Stock, without par value

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes   X      No ____

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S–K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10–K or any amendment to this Form 10–K. [X]

Indicate by checkmark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b–2).
Yes  X      No ___

The aggregate market value of voting stock held by non–affiliates of the Registrant was $159,222,577 as of June 30, 2004.  The number of shares of common stock outstanding as of February 28, 2005 was 116,220,959.

**UAL Corporation and Subsidiary Companies Report on Form 10–K**
**For the Year Ended December 31, 2004**

|  |  | Page |
|---|---|---:|
| **PART I** | | |
| Item 1. | Business | 3 |
| Item 2. | Properties | 16 |
| Item 3. | Legal Proceedings | 18 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 19 |
| | | |
| **PART II** | | |
| Item 5. | Market for the Registrant's Common Equity and Related Stockholder Matters | 20 |
| Item 6. | Selected Financial Data and Operating Statistics | 21 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 22 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 45 |
| Item 8. | Financial Statements and Supplementary Data | 47 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 92 |
| Item 9A. | Controls and Procedures | 92 |
| Item 9B. | Other Information | 97 |
| | | |
| **PART III** | | |
| Item 10. | Directors and Executive Officers of the Registrant | 97 |
| Item 11. | Executive Compensation | 104 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 110 |
| Item 13. | Certain Relationships and Related Transactions | 115 |
| Item 14. | Principal Accountant Fees and Services | 116 |
| | | |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statements and Schedules | 118 |

## PART I

### ITEM 1. BUSINESS.

UAL Corporation (together with its consolidated subsidiaries, "we," "our," "us," "UAL" or the "Company") was incorporated under the laws of the State of Delaware on December 30, 1968. Our world headquarters is located at 1200 East Algonquin Road, Elk Grove Township, Illinois 60007. Our mailing address is P.O. Box 66919, Chicago, Illinois 60666 (telephone number (847) 700-4000).

UAL is a holding company and its principal, wholly owned subsidiary is United Air Lines, Inc., a Delaware corporation ("United"). United's operations, which consist primarily of the transportation of persons, property and mail throughout the U.S. and abroad, accounted for most of UAL's revenues and expenses in 2004. United is one of the largest scheduled passenger airlines in the world with over 1,500 daily departures to more than 120 destinations in 26 countries and two U.S. territories. Through United's unsurpassed global route network, we serve virtually every major market around the world, either directly or through the Star Alliance™, which is the world's largest airline network. In addition to the Star Alliance, we provide regional service into our domestic hubs through marketing relationships with United Express regional carriers. In 2004, we launched a new low-fare service, called Ted, designed to serve select leisure markets in a way that allows us to be more competitive with other low-fare carriers.

Our web address is www.united.com. Through our website, our filings with the Securities and Exchange Commission ("SEC"),

Under Section 365 of the Bankruptcy Code, we may assume, assume and assign, or reject certain executory contracts and unexpired leases, including leases of real property, subject to the approval of the Bankruptcy Court and certain other conditions. By order of the Bankruptcy Court, our Section 365 rights to assume, assume and assign, or reject unexpired leases of non–residential real estate expire on the earlier of the date of termination of our exclusive period to file a plan of reorganization (currently, April 30, 2005) or the date of the conclusion of a disclosure statement hearing in connection with a proposed plan of reorganization.

In general, if we reject an executory contract or unexpired lease, it is treated as a pre–petition breach of the lease or contract in question and, subject to certain exceptions, relieves us of performing any future obligations. However, such a rejection entitles the lessor or contract counterparty to a pre–petition general unsecured claim for damages caused by such deemed breach and accordingly, the counterparty may file a claim against us for such damages. As a result, liabilities subject to compromise are likely to change in the future as a result of damage claims created by our rejection of various aircraft, executory contracts and unexpired leases. Generally, if we assume an aircraft financing agreement, executory contract or unexpired lease we are required to cure existing defaults under such contract or lease. We expect that the future assumption of certain executory contracts and unexpired leases may convert liabilities currently shown as subject to compromise to liabilities not subject to compromise.

Since the Petition Date, we have focused on transforming the Company to compete effectively in a fundamentally changed and difficult industry. For the first nineteen months of the restructuring, we worked to emerge from Chapter 11 protection with exit financing guaranteed by the Air Transportation Stabilization Board (the "ATSB"). During this time, we achieved average annual cash savings from all stakeholders of $5 billion annually, including savings from aircraft financiers, employees and retirees. In addition, we made substantial progress in restructuring United by not only achieving a lower labor and non–labor cost structure, but also by delivering superior levels of operating performance and customer satisfaction. Despite these accomplishments and the concessions made by United's stakeholders, in June 2004 the ATSB denied our application for a federal loan guarantee.

Following the ATSB's final denial, it became clear that the additional time needed to restructure further and obtain non–guaranteed exit financing would require us to remain in Chapter 11 longer than originally anticipated. In an effort to attract non–guaranteed exit financing, we undertook a comprehensive reevaluation of our business plan in order to identify all opportunities for further cost savings and revenue improvement. As part of this process, we worked in conjunction with certain members of, and advisors to, the Creditors' Committee to analyze key aspects of our business plan and reorganization. Given the continued harsh business realities currently facing the airline industry, we identified approximately $2 billion in additional annual labor and non–labor cash savings that we believed would be needed to obtain non–guaranteed exit financing. The Company expects to realize the full $2 billion in cash savings in fiscal year 2007.

During the fourth quarter 2004, we advised the Bankruptcy Court that the systemic changes in the industry and the continued harsh financial environment made termination and replacement of our defined benefit pension plans necessary, and that in addition to pension relief, our updated business plan would require further average annual labor savings from our union and non–union employees. In November 2004, we commenced the process available to us under Section 1113 of the Bankruptcy Code to modify our collective bargaining agreements ("CBAs") in an effort to achieve $725 million in average annual labor savings of the $2 billion target and to eliminate any requirement in our CBAs to maintain a defined benefit pension plan. For information on labor savings, see "Labor Restructuring" in Management's Discussion and Analysis of Financial Condition and Results of Operations.

To successfully emerge from Chapter 11, in addition to obtaining non–guaranteed exit financing, the Bankruptcy Court must confirm a plan of reorganization, the filing of which will depend on the timing and outcome of numerous ongoing matters in the Chapter 11 process. We expect to file a plan of reorganization that provides for UAL's emergence from bankruptcy later in 2005, but there can be no assurance that the Bankruptcy Court will confirm a plan of reorganization or that any such plan will be implemented successfully.

The reorganization plan will determine the rights and claims of various creditors and security holders. At this time, it is not possible to predict accurately the effect of the Chapter 11 reorganization process on our business, nor can we make any predictions concerning how each of these claims will be valued in the bankruptcy proceedings. We believe that UAL's presently outstanding equity securities will have no value and will be canceled under any plan of reorganization that we propose. For this reason, we urge that caution be exercised with respect to existing and future investments in any UAL security.

**Operations**

*Segments.* We operate our businesses through five reporting segments: North America, the Pacific, the Atlantic, and Latin America (each of which is operated by United) and UAL Loyalty Services, Inc. ("ULS"). Financial information on UAL's operating segments can be found in Note 18, "Segment Information" in the Notes to Consolidated Financial Statements.

During 2004, United carried approximately 71 million mainline revenue passengers and flew approximately 115 billion mainline revenue passenger miles. (UAL operating statistics do not include the operations of United Express regional carriers, since these entities are independent carriers.) United's network provides comprehensive transportation service within its North American segment and to international destinations within its Pacific, Atlantic and Latin American segments.

Operating revenues attributed to United's North America segment were $10.5 billion in 2004, $10.0 billion in 2003 and $10.4 billion in 2002. Operating revenues attributed to United's international segments were $5.1 billion in 2004, $4.2 billion in 2003 and $4.7 billion in 2002.

Exhibit 4

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

### FORM 10-K

[X]    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2003

OR

[ ]    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from _____ to _____

Commission File No. 1-6033

### UAL CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **36-2675207** |
| (State or other jurisdiction of | (IRS Employer |
| incorporation or organization) | Identification No.) |

| | |
|---|---|
| **Location: 1200 East Algonquin Road, Elk Grove Township, Illinois** | **60007** |
| **Mailing Address: P. O. Box 66919, Chicago, Illinois** | **60666** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code:  (847) 700-4000

Securities registered pursuant to Section 12(b) of the Act: None

Securities registered pursuant to Section 12 (g) of the Act:

Title of Each Class

Common Stock, $.01 par value

Depositary Shares each representing
1/1000 of a share of Series B
Preferred Stock, without par value

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes  X     No___

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

Indicate by checkmark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2).
Yes  X     No___

The aggregate market value of voting stock held by non-affiliates of the Registrant was $78,613,064 as of June 30, 2003. The number of shares of common stock outstanding as of February 20, 2004 was 110,617,714.

**UAL Corporation and Subsidiary Companies Report on Form 10-K**
**For the Year Ended December 31, 2003**

Page

PART I

Item 1.  Business.................................................................... 3
Item 2.  Properties................................................................. 17
Item 3.  Legal Proceedings.......................................................... 19
Item 4.  Submission of Matters to a Vote of Security Holders........................ 20

PART II

Item 5.  Market for the Registrant's Ordinary Shares and Related Stockholder Matters.................. 21
Item 6.  Selected Financial Data.................................................... 22
Item 7.  Management's Discussion and Analysis of Financial Condition and Results of Operations............................................................. 23
Item 7A. Quantitative and Qualitative Disclosures about Market Risk................. 44
Item 8.  Financial Statements and Supplementary Data............................... 46
Item 9.  Changes in and Disagreements with Accountants on Accounting and Financial Disclosure............................................................. 90
Item 9A. Controls and Procedures.................................................... 90

PART III

Item 10. Directors and Executive Officers of the Registrant......................... 91
Item 11. Executive Compensation..................................................... 95
Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters................................................................. 103
Item 13. Certain Relationships and Related Transactions............................. 109
Item 14. Principal Accountant Fees and Services..................................... 110

PART IV

Item 15. Exhibits, Financial Statements, Schedules and Reports on Form 8-K........... 112

## PART I

### ITEM 1. BUSINESS.

UAL Corporation (together with its consolidated subsidiaries, "we," "our," "us," "UAL" or the "Company") was incorporated under the laws of the State of Delaware on December 30, 1968. Our world headquarters is located at 1200 East Algonquin Road, Elk Grove Township, Illinois 60007. Our mailing address is P.O. Box 66919, Chicago, Illinois 60666 (telephone number (847) 700-4000).

UAL is a holding company and its principal, wholly owned subsidiary is United Air Lines, Inc., a Delaware corporation ("United"). United's operations, which consist primarily of the transportation of persons, property and mail throughout the U.S. and abroad, accounted for most of UAL's revenues and expenses in 2003. United is one of the largest scheduled passenger airlines in the world with over 1,600 daily departures to more than 110 destinations in 23 countries and two U.S. territories. Through United's unsurpassed global route network, we serve virtually every major market around the world, either directly or through the Star Alliance, which is the world's largest airline network. In addition to the Star Alliance, we provide regional service into our domestic hubs through partnerships with United Express carriers. In 2004, we added a new low-fare carrier, called Ted, designed to serve select leisure markets in a way that allows us to be competitive with other low-fare carriers.

Our web address is www.united.com. Through our website, our filings with the Securities and Exchange Commission ("SEC"), including annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and all amendments to those reports, are accessible (free of charge) as soon as reasonably practicable after such material is electronically filed with or furnished to the SEC.

*This Form 10-K contains various "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements represent the Company's expectations and beliefs concerning future events, based on information available to us on the date of the filing of this Form 10-K, and are subject to various risks and uncertainties. Factors that could cause actual results to differ materially from those referenced in the forward-looking statements are listed in the last paragraph of, "Outlook" in Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations. We disclaim any intent or obligation to update or revise any of the forward-looking statements, whether in response to new information, unforeseen events, changed circumstances or otherwise.*

### Bankruptcy Considerations

The following discussion provides general background information regarding our Chapter 11 cases, and is not intended to be an exhaustive summary. Specific information pertaining to our bankruptcy filing may be obtained through the website www.pd-ual.com.

The airline industry is highly competitive and labor intensive. Our business is highly sensitive to fuel costs, fare levels and demand for travel. Passenger demand and fare levels are influenced by, among other things, the state of the global economy, domestic and international events, airline capacity and pricing actions taken by carriers. Beginning in 2000, the slowing economy and decrease in high-yield business travel,

3

ATSB loan guarantee, we might be unable to obtain optimal or even sufficient funding to meet our future liquidity needs and reorganize successfully. As of the date of this filing, the ATSB has not yet reached a decision on our application.

To successfully exit Chapter 11, we must obtain confirmation by the Bankruptcy Court of a plan of reorganization. A plan of reorganization would, among other things, resolve our pre-petition obligations, set forth our revised capital structure and establish our corporate governance subsequent to exit from bankruptcy. We are currently operating under an "exclusive period," which expires on April 7, 2004, during which we are the only party permitted to file a plan of reorganization. The decision as to when we will file a plan of reorganization depends on the timing and outcome of numerous ongoing matters in the Chapter 11 process. These issues include our pending application for a federal loan guarantee from the ATSB, pension obligations, proposed changes to retiree medical benefits, Section 1110 aircraft restructuring efforts, municipal bond obligations, United Express contracts and the pre-petition claims. We expect to file a plan of reorganization that provides for UAL's emergence from bankruptcy, but there can be no assurance that the Creditors' Committee will support our positions or our plan of reorganization (disagreements between us and the Creditors' Committee could adversely affect our reorganization process, including our emergence from Chapter 11). Nor can there be any assurance that the Bankruptcy Court will confirm a plan of reorganization or that any such plan will be implemented successfully.

We are working towards emerging from Chapter 11 in the first half of 2004, but that timing is dependent on, among other things, the timely and successful confirmation and implementation of a plan of reorganization. The rights and claims of various creditors and security holders will be determined by the plan as well. At this time, it is not possible to predict accurately the effect of the Chapter 11 reorganization process on our business, nor can we make any predictions concerning how each of these claims will be valued in the bankruptcy proceedings. We believe that UAL's presently outstanding equity securities will have no value and it is expected that those securities will be canceled under any plan of reorganization that we propose. For this reason, we urge that caution be exercised with respect to existing and future investments in any UAL security.

For more information on our bankruptcy proceedings, see Management's Discussion and Analysis of Financial Condition and Results of Operations and Note 1, "Voluntary Reorganization Under Chapter 11" in the Notes to Consolidated Financial Statements.

## Operations

*Segments.* We operate our businesses through five reporting segments: North America, the Pacific, the Atlantic and Latin America, each of which is operated by United, and UAL Loyalty Services, Inc. ("ULS"). Financial information on UAL's operating segments can be found in Note 19, "Segment Information" in the Notes to Consolidated Financial Statements.

During 2003, United carried approximately 66 million passengers and flew approximately 104 billion revenue passenger miles. United's network provides comprehensive transportation service within its North American segment and to international destinations within its Pacific, Atlantic and Latin American segments.

# Exhibit 5

MORGENSTERN JACOBS & BLUE, LLC
Peter D. Morgenstern (PM-5021)
Gregory A. Blue (GB-9569)
885 Third Avenue, Suite 3020
New York, New York 10022
Telephone: (212) 750-6776
Facsimile:  (212) 750-3128

ATTORNEYS FOR THE OFFICIAL COMMITTEE
OF EQUITY SECURITY HOLDERS

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
In re:                                            :        Chapter 11
                                                  :
ADELPHIA COMMUNICATIONS CORP., *et al.*, :        Case No. 02-41729 (REG)
                                                  :        (Jointly Administered)
                                                  :
                    Debtors.                      :
                                                  :
------------------------------------------------------------X


**First Interim Application of Morgenstern Jacobs & Blue, LLC, Counsel
to the Official Committee of Equity Security Holders, for an Allowance
of Compensation and Reimbursement of Expenses Pursuant to
11 U.S.C. §§ 330, 331, 1102 and 1103**

## **Fee Summary**

| | |
|---|---|
| Name of Applicant: | Morgenstern Jacobs & Blue, LLC |
| Roles in Case: | Counsel to the Official Committee of Equity Security Holders |
| Period For Which Compensation And Expense Reimbursement Is Sought: | March 1, 2006 – August 31, 2006 |
| Amount of Fees Requested: | $ 2,047,395.00 |
| Amount of Expense Reimbursement Requested: | $    36,725.93 |
| Total Amount of Compensation Requested: | $ 2,084,120.93 |
| Payments Received With Respect to Fees Requested In the First Interim Application: | $ 1,347,717.55 |
| Amount of Fees Held Back (20%) With Respect to Fees Requested in the First Interim Application: | $   409,479.00 |
| Payments Received With Respect to Expense Reimbursement Sought in the First Interim Application: | $   36,725.93 |

This is an  _x_ Interim Application.    ___Final Application.

MORGENSTERN JACOBS & BLUE, LLC
Peter D. Morgenstern (PM-5021)
Gregory A. Blue (GB-9569)
885 Third Avenue
New York, New York 10022
Telephone: (212) 750-6776
Facsimile: (212) 750-3128

*Attorneys for the Official Committee of Equity Security Holders*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X
In re:                                            :
                                                  :
ADELPHIA COMMUNICATIONS CORP., *et al.*,          :       Chapter 11
                                                  :       Case No. 02-41729 (REG)
         Debtors.                                 :       (Jointly Administered)
                                                  :
                                                  :
-----------------------------------------------------------------X


**First Interim Application of Morgenstern Jacobs & Blue, LLC, Counsel to the Official Committee of Equity Security Holders, for an Allowance of Compensation and Reimbursement of Expenses Pursuant to <u>11 U.S.C. §§ 330, 331, 1102 and 1103</u>[1]**

**TO THE HONORABLE ROBERT E. GERBER,**
**UNITED STATES BANKRUPTCY JUDGE:**

The law firm of Morgenstern Jacobs & Blue, LLC ("MJB"), counsel to the Official

Committee of Equity Security Holders (the "Equity Committee") of Adelphia Communications

Corporation ("ACC"), respectfully submits this First Interim Application (the "Application") for

---

[1]       By Order dated October 24, 2003, this Court authorized the Equity Committee to retain Bragar Wexler Eagel & Morgenstern, P.C. ("BWEM") as its substitute general counsel *nunc pro tunc*, to October 3, 2003. As of January 1, 2006, almost all of the attorneys from BWEM who were responsible for the representation of the Equity Committee left BWEM to form MJB. By Order dated January 10, 2006, this Court authorized the Equity Committee to retain MJB as its substitute general counsel *nunc pro tunc*, to January 1, 2006 (the "MJB Substitute General Counsel Retention Order"). A copy of the Order is annexed hereto as <u>Exhibit A</u>.

entry of an order allowing compensation and reimbursement of expenses pursuant to sections 330, 331, 1102 and 1103 of Title 11, United States Code (the "Bankruptcy Code") and Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), in the total amount of **$2,084,120.93**, representing fees in the amount of **$2,047,395.00** and actual and necessary expenses incurred in the amount of **$36,725.93** for the First Interim Period commencing March 1, 2006 through and including August 31, 2006 (the "Compensation Period"). In support of this Application, MJB respectfully represents as follows:

## Jurisdiction

1.      This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334 and the "Standing Order of Referral of Cases to Bankruptcy Judges," dated July 10, 1984, of District Court Judge Robert T. Ward.  Venue is proper pursuant to 28 U.S.C. § 1409.  The statutory predicates for the relief sought herein are sections 330 and 331 of the Bankruptcy Code and Bankruptcy Rule 2016.

## Background

2.      On June 10, 2002, June 25, 2002, October 6, 2005, and March 31, 2006, ACC and certain of its subsidiaries and affiliates (collectively, the "Debtors") commenced cases under chapter 11 of the Bankruptcy Code.  Each of the Debtors continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      ACC, a Delaware corporation and the ultimate parent Debtor, owns all of the issued and outstanding shares of ACC Investment Holdings, Inc., a Delaware corporation, and

ACC Operations, Inc., a Delaware corporation, which, in turn, directly or indirectly owns, controls or holds interests in almost all of the remaining Debtors.

4.      The Debtors' chapter 11 cases have been consolidated for procedural purposes and are being jointly administered pursuant to Bankruptcy Rule 1015(b). On July 31, 2002, the Office of the United States Trustee for the Southern District of New York (the "United States Trustee") appointed the Equity Committee to represent the equity security holders of Adelphia pursuant to section 1102 of the Bankruptcy Code.  The following three (3) equity holders served as members of the Equity Committee during the Compensation Period:

- Leonard Tow for himself and on behalf of Claire Tow, the Tow Charitable Remainder Trust #1, the Tow Foundation Inc., The Leonard and Claire Tow Charitable Trust, Inc., the Claire Tow Trust, Citizens Communications Company and CU Capital Corp;

- AIG DKR Sound Shore Funds; and

- Highbridge Capital Corp.

## The Applicant

8.      The Equity Committee selected MJB as counsel based on MJB's extensive experience and knowledge in the fields of bankruptcy, general commercial litigation, and the investigation and prosecution of claims and causes of action on behalf of defrauded investors and creditors.  MJB's attorneys have appeared in numerous complex chapter 11 proceedings before this and other courts throughout the United States.

## Compensation and Reimbursement

9.    This is MJB's First Interim Application.  In accordance with this Court's Order

dated August 9, 2002, entitled "Order Under Local Rule 2016-1 And 11 U.S.C. §§ 105(a) and

331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of

Professionals and Committee Members Procedures" (the "Standing Order"), MJB submitted

monthly fee statements for the Compensation Period.  MJB reserves the right to supplement this

Application and to make further application to the Court for allowance of fees and expenses

incurred during the Compensation Period but not included herein.

10.    MJB seeks approval of the sum of **$2,047,395.00** for legal services rendered on

behalf of the Equity Committee during the Compensation Period and **$36,725.93** for

reimbursement of expenses incurred in connection with the rendition of such services, for a total

award of **$2,084,120.93**.

11.    Pursuant to the Standing Order, MJB has received payments of **$1,384,443.48**,

representing eighty percent (80%) of MJB's fees for legal services rendered during March 1,

2006 to July 31, 2006.  On October 16, 2006, MJB submitted its Fee Statement for the month of

August 2006, and anticipates payment of eighty percent (80%) of fees for legal services incurred

during that month ($288,468.00).  MJB also has received payments of **$34,995.48** representing

one hundred percent (100%) of MJB's expenses for the period March 1, 2006 to July 31, 2006,

and anticipates payment of 100% of its disbursements for August 2006 ($1,730.45).  By this

Application, MJB now seeks allowance of all fees and disbursements incurred during the

Compensation Period and payment of **$409,479.00** (the "Holdback Amount") for legal services

rendered during the Compensation Period, which represents the twenty percent (20%) of MJB's

4

fees held back pursuant to the Standing Order (including twenty percent (20%) of MJB's fees incurred during August 2006).

12.    During the Compensation Period, MJB's attorneys and paraprofessionals expended a total of **4,342.8** hours for which compensation is requested.  A schedule setting forth the number of hours expended by each partner, counsel, associate, and paraprofessional of MJB who rendered services to the Equity Committee, their respective hourly rates, and the year in which each attorney was admitted to the bar, is annexed hereto as Exhibit B.[2]  A schedule setting forth the blended rates for attorneys who billed time during the Compensation Period is also annexed hereto as Exhibit C.

13.    MJB maintains contemporaneously created computerized records of the time spent by all MJB attorneys and paraprofessionals in connection with the firm's representation of the Equity Committee in these cases.[3]  The professional services that MJB rendered during the Compensation Period as general counsel to the Equity Committee are separately grouped into the titled categories of project matters set forth in the schedule annexed hereto as Exhibit D.  A schedule specifying the expenses for which MJB is seeking reimbursement is annexed hereto as Exhibit E.

14.    As more fully described below, MJB has rendered professional services during the Compensation Period as general counsel to the Equity Committee concerning a wide variety of matters and issues within the scope of its retention.  In the course of providing such services,

---

[2]    Consistent with its ordinary practice of adjusting hourly rates in the month of August, MJB increased its hourly rates effective August 1, 2006 for Peter D. Morgenstern, Gregory A. Blue, Eric B. Fisher, Andrew L. Buck, Kris Druhm, Rachel K. Marcoccia, Sean R. Gatewood, and Laura J. Lefkowitz.

[3]    Copies of the daily time records are being provided to the Court and the Office of the United States Trustee.  Parties in interest required to be served with MJB monthly fee statements pursuant to the Standing

5

MJB has been mindful of the importance of keeping its fees and expenses as low as reasonably possible while fulfilling its obligations to provide the Equity Committee with proper legal representation. In this regard, and as reflected in MJB's time records, whenever reasonable and appropriate to do so, MJB has coordinated its activities with those of counsel for the Debtors, counsel for the Official Committee of Unsecured Creditors (the "Creditors' Committee"), and other parties in interest.

15.     Consistent with the applicable provisions of the Bankruptcy Code, MJB has received no payment or promises of payment from any source for services rendered or to be rendered in any capacity whatsoever in connection with these cases, except for those fees and expenses that will be, or have been, paid by the Debtors in accordance with the Standing Order. In addition, there is no agreement or understanding between MJB and any other person or entity, other than members of MJB, for the sharing of compensation to be received for services that MJB renders in these cases.

16.     The certification of Peter D. Morgenstern pursuant to the Local Guidelines is annexed hereto as Exhibit F.

## Summary of Professional Services Rendered to the Equity Committee During the Compensation Period

17.     The following summary description of services is intended to highlight certain of the professional services rendered by MJB during the Compensation Period. This summary is not intended to be a complete statement of all professional services rendered, but serves only to provide a general description of the services rendered by MJB during the Compensation Period.

Order have previously been furnished with such daily time records. Copies of the time records will be made

Those services that required MJB's special attention, effort and skill, grouped by certain

categories which incorporate MJB's project codes in accordance with the guidelines promulgated

by the Office of the United States Trustee.[4]  A detailed description and breakdown of the

services provided by MJB during the Compensation Period are set forth in the contemporaneous

time reports and disbursement summary.

I.     **Legal Services Rendered and Actual and Necessary Expenses Incurred by MJB in Connection with the Debtors' Modified Fourth Amended, Second Modified Fourth Amended, Third Modified Fourth Amended and Fifth Amended Joint Plans and First and Second Supplements to the Disclosure Statements**

18.     In accordance with an order of the Court dated April 6, 2006, the Debtors filed

their Modified Fourth Amended Joint Plan and Supplement to the Disclosure Statement on April

12, 2006.  The Modified Fourth Amended Plan and Disclosure Statement differed significantly

from the Debtors' previously filed plans.  In particular, that plan offered constituents two

options: a "holdback" plan consistent with prior plan iterations, wherein amounts would be held

in escrow pending resolution of the Inter-Creditor Disputes, and a "settlement" plan, wherein

those disputes would be settled as set forth in the plan.  The substantial changes from the prior

plan structure required MJB attorneys to expend significant effort reviewing and analyzing those

changes, conducting legal research, and consulting with the Equity Committee's financial

advisors concerning the economic impact of those changes.

19.     On May 26, 2006, the Court signed an Order to Show Case submitted by the

Debtors, which scheduled hearings to consider the entry of orders approving, *inter alia*, the sale

---

available to other parties in interest upon reasonable request.
[4]     For purposes of economy, the discussion of some of the matters in this Application has been combined due to the similarity of the services rendered within certain of the categories.

of substantially all assets of ACC and its affiliated debtors, pursuant to Section 363 of the Bankruptcy Code. (the "363 Motion").

20.     Thereafter, on June 2, 2006, the Debtors submitted a Proposed Order to establish new confirmation procedures and deadlines, approve the Supplemental Disclosure Statement, a motion to approve certain modifications to the Plan of Reorganization for the Century-TCI Debtors and Parnassos Debtors (the "Joint Venture Plan"), and a proposed amendment to the their motion for sale pursuant to Section 363 of the Bankruptcy Code.

21.     The Debtors filed their Second Modified Fourth Amended Joint Plan for Century-TCI Debtors and Parnassos Debtors on June 6, 2006.  The Debtors amended the Joint Venture Plan once more and filed the Third Modified Fourth Amended Plan for Century-TCI Debtors and Parnassos Debtors on June 26, 2006.

22.     On June 28, 2006, the Court signed an Order approving the sale pursuant to Section 363 of the Bankruptcy Code of substantially all of ACC's assets to Time Warner NY Cable LLC and Comcast Corporation.[5]

23.     The next day, the Court signed an Order confirming the Third Modified Fourth Amended Plan.

24.     Subsequently, on August 18, 2006, the Debtors filed their Second Supplement to the Disclosure Statement, in addition to their Fifth Amended Joint Plan.

25.     During the Compensation Period, MJB attorneys met and communicated regularly with members of the Equity Committee to discuss potential Plan and Disclosure Statement objections, and exchanged correspondence with Debtors' counsel regarding the Equity

---

[5]     On June 30, 2006, JPMorgan Chase Bank, N.A. appealed from the Order authorizing the sale pursuant to Section 363 of the Bankruptcy Code.

8

Committee's comments to the Debtors' various Fourth and Fifth Amended Plans and Disclosure Statements. MJB attorneys also drafted and filed objections to the Fourth Amended Plan and Second Supplement to the Disclosure Statement and reviewed all related objections filed by the other parties and attended hearings in connection therewith.

26.     Additionally, throughout the Compensation Period, MJB attorneys expended a significant amount of time addressing the issues of post-petition interest, "grid" interest, and other interest issues. MJB attorneys conferred with the Equity Committee's financial advisors regarding the proposed interest calculations, researched the appropriate standards and circumstances for the application of such interest, and participated in hearings in connection with motions to allow post-petition interest and "grid" interest.

27.     MJB attorneys also spent a significant amount of time analyzing the motions filed by the Official Committee of Unsecured Creditors (the "Creditor Committee Motions") seeking to (i) hold back distributions to the pre-petition bank lenders; and (ii) estimate certain claims of bank lenders in connection with the Debtors' Modified Fourth Amended Joint Plan. MJB attorneys reviewed and analyzed the all of these motions, drafted responses, corresponded with other parties, and attended the subsequent court hearings.

## II.     Legal Services Rendered and Actual and Necessary Expenses Incurred by MJB in Connection with the Motion in Aid Process

28.     Prior to the Compensation Period, the Debtors filed the "Motion in Aid of Confirmation" to establish a process to resolve any inter-company claims in advance of confirmation (the "MIA Process"). MJB, on behalf of the Equity Committee, was actively involved in the establishment of the MIA Process, regularly attending Bankruptcy Court hearings related to the procedure and corresponding with the varying parties.

29.     In connection with the MIA Process, MJB attorneys consulted with experts regarding the characterization of certain inter-company transactions and the allocation of value among the various Debtor Groups.  Subsequently, MJB attorneys assisted in the preparation of an expert report addressing (i) the methodology by which value from the Time Warner/Comcast acquisition should be allocated and distributed; and (ii) whether the process by which the Debtors determined the inter-company balances owed to Adelphia Cablevision, LLC was reasonable.

30.     Attorneys from MJB also conferred with counsel for various constituencies regarding inter-company transactions and issues, reviewed relevant public filings and analyzed and drafted alternate inter-company scenarios as part of the Equity Committee's investigation regarding inter-company transactions.

31.     Hearings in connection with the MIA process began in February, 2006.  MJB attorneys prepared for and attended all of these hearings.  MJB attorneys continued to attend these hearings throughout the Compensation Period.   Additionally, MJB attorneys researched, drafted and submitted a pretrial brief in connection with Hearing 4 of the MIA Process, addressing allocation of proceeds from the sale of the Debtors' assets among the various Debtor Groups.  MJB attorneys also reviewed and analyzed the Hearing 4 Pretrial Briefs from the other interested parties and prepared a Hearing 4 Reply Brief for submission to the Court.

32.     Throughout the Compensation Period, MJB attorneys engaged in a series of conferences with Chanin Capital Partners ("Chanin"), the Equity Committee's financial advisors, regarding inter-company claims and transactions as part of the Equity Committee's investigation

of inter-company transactions. MJB attorneys continued to analyze legal issues concerning various inter-company claims and transfers.

33.    In May 2006, Judge Gerber directed that certain participants in the MIA Process (*i.e.* the Ad Hoc Committees of Arahova, ACC Senior, and FrontierVision Noteholders, as well as W.R. Huff Asset Management Co. and a newly-formed ad hoc committee of Holders of both ACC Senior and Arahova Notes) attend formal negotiation sessions to be conducted and observed by Judge Cecelia Morris, Bankruptcy Judge. On June 21, 2006, Judge Morris submitted a "Monitor's Report," expressed in the form of a term sheet, to the Court.

34.    MJB attorneys expended significant effort reviewing and analyzing the scope and impact of the Monitor's Report and the proposed settlement contained therein. MJB attorneys also attended numerous status conferences in connection with the Monitor Report and the negotiation process that led to the filing of the Monitor Report.

35.    As holders of equity interests only at the ACC parent level, equity holders represented by the Equity Committee have a keen interest in the outcome of the MIA Process, the treatment of inter-company claims, and the allocation of claims and assets in Adelphia's complex capital structure.

III.    **Legal Services Rendered and Actual and Necessary Expenses Incurred by MJB in Connection with the Government Settlement**

36.    Prior to the Compensation Period, Debtors filed an application seeking the Bankruptcy Court's approval of a settlement between and among: (i) the Debtors (ii) the Rigases; (iii) the Department of Justice; and (iv) the Securities and Exchange Commission (the "Government Settlement Motion").

37.     After the Bankruptcy Court granted the relief requested in the Government Settlement Motion, MJB attorneys were actively involved in the appeal of the Bankruptcy Court's order to the District Court, filing a cross-appeal which sought review of the Bankruptcy Court's decision to grant the bank liens in connection with the Government Settlement. MJB attorneys conferred regularly with counsel for the Debtors, the Creditors' Committee, and the other appellants, to coordinate consolidation of the various appeals, and to prepare a schedule for the consolidated appeal, including presentation of the briefing schedule to the District Court. On February 23, 2006, the District Court issued a Memorandum and Order upholding the Bankruptcy Court's decision to reinstate the pre-petition liens as part of the approval of the Government Settlement.  Accordingly, MJB cross-appealed the decision to the United States Court of Appeals for the Second Circuit.

38.     During the Compensation Period, MJB attorneys prepared and filed a Notice of Cross Appeal with the Second Circuit.  MJB attorneys conferred with counsel for the Creditors' Committee regarding the preparation of the joint appendix and joint brief.  In addition, MJB reviewed and analyzed the Appellants' brief, and researched and drafted a brief in support of the Equity Committee's cross-appeal.

## IV.     Legal Services Rendered and Actual and Necessary Expenses Incurred by MJB in Connection with the Debtors' Sale of its Assets

39.     Prior to the Compensation Period, MJB attorneys were actively involved with the analysis of the Debtors' proposed sale of its assets to Time Warner and Comcast.  In particular, MJB attorneys were involved with discussions with the Debtors and other parties regarding the

12

impact of the Debtors' proposed "supplemental bid protections," including a break-up fee and modified fiduciary out.

40.    During the Compensation Period, as discussed in Paragraph 19, *supra,* the Debtors filed the 363 Motion seeking to sell substantially all of their assets.  MJB attorneys with the assistance of individuals from Chanin, continued to analyze issues surrounding this sale. MJB attorneys discussed strategy regarding the potential sale, researched and prepared a response to the Debtors' 363 Motion and prepared for and attended several conferences and court hearings regarding the potential sale.

## V.    Prosecution of Potential Claims Against the Banks

41.    As this Court is aware, prior to the Compensation Period, MJB filed a motion seeking authority to intervene in the Adversary Proceeding commenced by the Creditors' Committee against the Debtors' pre-petition lenders and investment banks (collectively, the "Banks") and to assert thirteen additional claims which were not included in the Creditors' Committee's Complaint, including claims under the Racketeer Influenced and Corrupt Organizations Act statute which, if upheld, may result in multi-billion dollar recoveries to the Debtors' estates.  The potential recovery or creation of additional value to the Debtors' estates through pursuit of potential claims and causes of action is particularly important to the equity security holders in these cases because of the nature of such potential claims and the enormity of the losses suffered as a result of the company's demise.  MJB spent considerable time during the Compensation Period rendering legal services in connection with the Equity Committee's prosecution of those claims against the Banks.

13

42.     In August 2005, this Court entered a decision granting the motions of the Equity Committee to pursue its claims against the Banks, and denying the Banks' motions to dismiss (the "Standing Decision"). During the Compensation Period MJB attorneys analyzed the impact of the Standing Decision, continued to their discuss litigation strategies in pursuit of these claims.

43.     Additionally, MJB attorneys commenced a review of the documents on the Case Central Database, provided in response to the Equity Committee's discovery requests. MJB attorneys not only reviewed the documents, but continued to update the pertinent research in connection with the prosecution of the bank litigation claims.

## VI.     Other Professional Services Rendered and Actual and Necessary Expenses Incurred by MJB

44.     In the course of providing services, MJB has been mindful of the importance of keeping its fees and expenses as low as reasonably possible, in order to minimize the financial burden on the Debtors' estates, balanced against MJB's obligation to provide the Equity Committee with proper legal representation.

45.     In addition to the services rendered by MJB as described above, MJB also rendered the following professional services in connection with the project matters described below:

(A)     Asset Disposition

46.     During the Compensation Period, MJB reviewed motions and agreements filed by the Debtors to sell various assets and reviewed notices of sale of excess assets and abandonment of certain property filed by the Debtors.

14

(B)    Case Administration

47.    MJB performed a multitude of tasks in the administration of these cases during the Compensation Period, including the regular review of pleadings, motions, applications, orders and other documents filed by the Debtors and other parties in interest in these cases, and calendaring hearing and pending motion dates.  Examples of such motions and notices include the 363 motion, the grid interest motion, and post-petition interest motions, supplemental retention disclosures filed by various professionals, and the Debtors' operating reports.  MJB regularly responded to investor inquiries regarding the status of the cases and reviewed news articles, analyst reports and press releases regarding the state of the Debtors' business operations and aspects of their reorganization.

(C)    Fee Statements/Fee Applications

48.    During the Compensation Period, MJB drafted its fee statements for the months of March, April, May, June, July and August 2006, as well as assisted other professionals employed by the Equity Committee in their efforts to comply with the applicable rules and procedures relative to the preparation of monthly fee statements.  MJB also drafted and/or assisted other Equity Committee professionals in the preparation of their fee applications for the same interim fee period.

(D)    Meetings of Committee

49.    During the Compensation Period, MJB participated in numerous conferences and communications with the Equity Committee and its other professionals regarding every aspect of the chapter 11 cases, including, but not limited to, the Debtors' various Fourth and Fifth Amended Plans of Reorganization and Disclosure Statements (including first and second supplements thereto), issues involving the Rigases' managed entities, the Creditor Committee

15

Motions, the MIA Process, and other pertinent case issues. MJB drafted memoranda to the

Equity Committee in order to keep its members informed regarding developments in the cases, to

develop and implement strategy regarding various issues, to provide advice regarding proposed

courses of action for the Equity Committee, and to implement the courses of action adopted by

the Equity Committee.

        (E)     <u>Non-Firm Retentions</u>

50.    During the Compensation Period, MJB reviewed supplemental disclosures filed

by several of the Debtors' and other constituencies' retained professionals in these cases.

        (F)     <u>Other Related Litigation</u>

51.    MJB monitored the status of pending related litigation, including, but not limited

to, Adelphia's action against Deloitte & Touche, and the Multi-District Litigation pending before

Judge McKenna in the United States District Court for the Southern District of New York, and

reviewed and analyzed the pleadings in those proceedings.

        (G)  <u>Third-Party Claims</u>

52.    MJB monitored and analyzed various adversary proceedings filed in connection

with the resolution of third party claims, including the Debtors' action against Leonard Tow, a

member of the Equity Committee,[6] and the Creditors' Committee's action against the Securities

and Exchange Commission.

---

[6]    MJB does not represent Leonard Tow individually in connection with this adversary proceeding.

(H)    Century/ML Media Cable Venture

53.    MJB closely monitored the Century/ML Cable Venture bankruptcy proceeding to render advice to the Equity Committee as to positions that the Equity Committee should take with respect to disputes arising in the case.

(I)    Avoidance Actions

54.    MJB closely monitored extensions of tolling agreements executed by the Debtors with respect to the Rigases, the Banks and other current and potential litigants. MJB also analyzed the Debtors' motion to stay avoidance actions, and reviewed orders entered by the Court regarding the abandonment of avoidance actions and the tolling of periods to commence litigation. In addition, MJB attorneys conferred with Debtors' counsel regarding opposition to the Debtors' motion to extend the period for service of summonses and complaints.

## Disbursements

55.    In connection with the provision of the legal services detailed in the Exhibits hereto and summarized above, MJB has incurred necessary out-of-pocket disbursements for the Compensation Period in the amount of **$36,725.93**. This amount is segregated into categories of charges, and rates, and a complete summary of the expenses incurred for the period is attached hereto as part of Exhibit E.

56.    MJB seeks reimbursement only of its actual and necessary costs incurred and expended reasonably in the course of its representation of the Equity Committee in these cases. With respect to photocopying expenses, MJB charges $.10 per page. With respect to facsimile expenses, MJB charges only for outgoing transmissions at a flat rate of $.50 per page (it does not

charge anything for incoming transmissions or applicable toll charges). No facsimile or photocopy charges are incorporated into MJB's hourly billing rates. It is MJB's policy to charge its clients only the amount actually incurred by MJB in connection with its expenses. Examples of such expenses are postage, overnight mail, courier delivery, transportation, overtime expenses, computer assisted legal research, photocopying, and out-going facsimile transmissions. Only clients who actually use photocopying, facsimile, and other office services of the types set forth in Exhibit F are charged for such services.

57. The time constraints frequently imposed by the circumstances of these cases have required MJB's attorneys and other employees on some occasions to devote time during the evenings and on weekends to the performance of legal services on behalf of the Equity Committee. While not frequent, these services were essential in order to meet deadlines imposed by the exigencies of these cases.

58. Consistent with MJB's policies, attorneys and other employees who worked late into the evenings were reimbursed for their reasonable meal costs and their cost for transportation home. MJB does not include those charges in overhead when establishing billing rates, but instead charges its clients for these and all other out-of-pocket disbursements only to the extent they are incurred while providing services to the particular client to whom they are billed.

59. In addition, due to the national nature of the Debtors' businesses and the dispersion of parties in interest and their professionals, long distance telephone calls occasionally have been required and billed accordingly. Similarly, charges may reflect overnight delivery of documents and other materials to the extent such delivery was necessitated by the circumstances.

18

In short. MJB has determined that all expenses incurred in providing professional services and charged to the Equity Committee were necessary, reasonable and justified under the circumstances to serve the needs of the Equity Committee in these cases.

## Interim Compensation is Warranted

60.     MJB respectfully submits that its representation of the Equity Committee during the Compensation Period justifies compensation in the amount hereby requested. Thus, MJB requests that one hundred percent (100%) of its requested compensation be allowed at this time.

61.     MJB respectfully submits that the compensation and reimbursement requested herein is both fair and reasonable in accordance with the factors set forth in section 330 of the Bankruptcy Code in respect of (a) the complexity of these cases, (b) the time expended, (c) the nature and extent of the services rendered, (d) the value of such services, and (e) the costs of comparable services other than in a case under this title. During the Compensation Period, the issues analyzed by MJB were complex and required, at times, extensive research and drafting.

62.     Since this Application does not present any novel or difficult issues of law, MJB respectfully requests that the Court waive the requirement of submission of a memorandum of law pursuant to Local Bankruptcy Rule 9013.

63.     No other or prior application or motion for the relief requested herein has been made to this or any other Court.

WHEREFORE, for all of the foregoing reasons, MJB respectfully requests that this Court (i) allow, approve, and award it compensation for professional legal services rendered as attorneys for the Equity Committee in the amount of **$2,047,395.00** for fees and **$36,725.93** for reimbursement of actual and necessary expenses incurred during the Compensation Period, and authorize and direct the Debtors to pay MJB the aggregate amount of **$2,084,120.93** less any portion of this amount they have paid as of the date of the order approving this Application, and (ii) grant such other and further relief to MJB as this Court may deem just and proper.

Dated:    New York, New York
          October 24, 2006

                                   MORGENSTERN JACOBS & BLUE, LLC

                                   By: /s/ Peter D. Morgenstern
                                          Peter D. Morgenstern (PM-5021)
                                          Gregory A. Blue (GB-9569)
                                   885 Third Avenue
                                   New York, NY 10022
                                   Tel: (212) 750-6776
                                   Fax: (212) 750-3128

                                   *Attorneys for the Official Committee of Equity Security Holders*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

|   |   |
|---|---|
| In re | : Chapter 11 |
|  | : Case No.:  02-41729 (REG) |
|  | : Jointly Administered |
| Adelphia Communications Corporation., et al., | : |
|  | : |
| Debtors. | : |
|  | : |

------------------------------------------------------------

### ORDER APPROVING RETENTION OF MORGENSTERN JACOBS &
### BLUE, LLC AS SUBSTITUTE GENERAL COUNSEL
### FOR THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS

Upon the application, (the "Application") of the Official Committee of Equity

Security Holders of Adelphia Communications Corporation (the "Equity Committee") for

an order pursuant to §§ 1103 and 328 of title 11 of the United States Code (the

"Bankruptcy Code"), and Rule 2014 of the Federal Rules of Bankruptcy Procedure,

authorizing the Equity Committee to retain the firm of Morgenstern Jacobs & Blue, LLC

("MJB") as its substitute general counsel; and upon the affidavits of Peter D.

Morgenstern (the "Morgenstern Affidavit"), which is annexed to the Application; and the

Court being satisfied that, except as set forth in the Morgenstern Affidavit, MJB

represents no interest adverse to the above-captioned debtors' (the "Debtors") estates

with respect to the matters upon which the firm is to be engaged, that said firm is a

"disinterested person" within the meaning of § 101(14) of the Bankruptcy Code, and that

the employment of MJB as general counsel is necessary and in the best interests of the

Equity Committee; and notice having been given to the United States Trustee for the

Southern District of New York, to the Debtors, the Official Committee of Unsecured

Creditors and to those parties that have filed requests for notices in these cases pursuant

to Bankruptcy Rule 2002, and no other notice being required; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED, that the Application is granted as provided herein; and it is further

ORDERED, that the Equity Committee is authorized to retain MJB as its counsel in these Chapter 11 cases, effective *nunc pro tunc* as of January 1, 2006; and it is further

ORDERED, that the compensation to be paid to MJB for professional services rendered and reimbursement for expenses incurred by it shall be as determined by this Court upon proper application pursuant to §§ 328, 330 and 331 of the Bankruptcy Code; and it is further

ORDERED, that this Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated:  New York, New York
        January *10*, 2006


                                            *S/ Robert E. Gerber*
                                    _____
                                    UNITED STATES BANKRUPTCY JUDGE



No Objection:

Office of the United States Trustee

By:  _/s/ Tracy Hope Davis_____
        Tracy Hope Davis

**Exhibit B**

| Name of Working Attorney | Year Admitted to Bar | Hours | Rate | Fees Earned |
|---|---|---|---|---|
| **Partners** | | | | |
| Morgenstern, Peter D. | 1983 | 550.80 | $660.00 | $363,528.00 |
| Morgenstern, Peter D.* | 1983 | 58.40 | $720.00 | $42,048.00 |
| Blue, Gregory A. | 1996 | 263.70 | $510.00 | $134,487.00 |
| Blue, Gregory A.* | 1996 | 36.40 | $550.00 | $20,020.00 |
| Fisher, Eric B. | 1996 | 345.40 | $490.00 | $169,246.00 |
| Fisher, Eric B.* | 1996 | 89.30 | $540.00 | $48,222.00 |
| Jacobs, Mark | 1983 | 122.70 | $600.00 | $73,620.00 |
| Lane, Les | 1999 | 160.10 | $440.00 | $70,444.00 |
| **Counsel** | | | | |
| Selby, Steven | 1989 | 674.70 | $550.00 | $371,085.00 |
| Buck, Andrew L. | 1997 | 604.00 | $480.00 | $289,920.00 |
| Buck, Andrew L.* | 1997 | 135.90 | $510.00 | $69,309.00 |
| **Associates** | | | | |
| Battin, Raejean | 1998 | 100.90 | $380.00 | $38,342.00 |
| Marcoccia, Rachel K. | 2002 | 110.60 | $320.00 | $35,392.00 |
| Marcoccia, Rachel K.* | 2002 | 24.00 | $350.00 | $8,400.00 |
| Lefkowitz, Laura J. | 2002 | 397.30 | $320.00 | $127,136.00 |
| Lefkowitz, Laura J.* | 2002 | 119.90 | $350.00 | $41,965.00 |
| Gatewood, Sean | 1997 | 126.30 | $320.00 | $40,416.00 |
| Gatewood, Sean* | 1997 | 74.90 | $350.00 | $26,215.00 |
| Druhm, Kris | 1998 | 20.80 | $320.00 | $6,656.00 |
| Druhm, Kris* | 1998 | 92.10 | $350.00 | $32,235.00 |
| **Paralegals** | | | | |
| Payne, Kandra | | 152.60 | $165.00 | $25,179.00 |
| Abell, Alice | | 82.00 | $165.00 | $13,530.00 |
| **TOTAL HOURS & FEES:** | | **4,342.80** | | **$2,047,395.00** |

*Consistent with its ordinary practice and as disclosed in its retention affidavit, MJB raised its hourly rates, effective as of August 1, 2006, for Peter D. Morgenstern, Gregory A. Blue, Eric B. Fisher, Andrew L. Buck, Kris Druhm, Rachel K. Marcoccia, Sean R. Gatewood and Laura J. Lefkowitz. The new rates are MJB's standard billing rates for these individuals.

## Exhibit C

### SCHEDULE OF BLENDED RATES

| Professionals | Blended Rate | Total Hours Billed | Total Compensation |
|---|---|---|---|
| Partners | $566.52 | 1,626.80 | $921,615.00 |
| Counsel | $516.27 | 1,414.60 | $730,314.00 |
| Associates | $334.42 | 1,066.80 | $356,757.00 |
| **Total/Blended Rate** | | 4,108.20 | $2,008,686.00 |

**Exhibit D**

March 1, 2006 – August 31, 2006

| Service Category | Hours | Fees Earned |
|---|---|---|
| Asset Disposition | 2.70 | $1,188.00 |
| Bank Litigation | 693.80 | $328,867.00 |
| Case Administration | 157.90 | $60,832.50 |
| Claims Analysis | 37.40 | $19,257.00 |
| Debtor in Possession Financing | 2.70 | $1,274.00 |
| DO Litigation | 5.50 | $2,090.00 |
| Fee Applications | 68.40 | $21,960.00 |
| Fee Statements | 186.00 | $35,620.50 |
| Meetings of Committee | 17.30 | $9,918.00 |
| Non-Firm Retentions | 1.20 | $657.00 |
| Other Related Litigation | 195.70 | $86,116.50 |
| Plan & Disclosure Statement | 2,974.20 | $1,479,614.50 |
| | | |
| **TOTAL** | **4,342.80** | **$2,047,395.00** |

**Exhibit E**

| Form of Disbursement | Disbursement Amount |
|---|---|
| Computer Legal Research | $7,578.41 |
| Courier Service | $293.37 |
| Internal Copy Expense | $2,104.20 |
| Transcript Copies and Related Costs | $115.50 |
| External Copy Expense | $25,485.99 |
| Filing Fees | $294.00 |
| Transportation | $413.85 |
| Meals | $26.20 |
| Postage | $354.41 |
| Velobinding | $60.00 |
| | |
| **TOTAL** | **$36,725.93*** |

*The total amount of disbursements on MJB's August 2006 fee statement was listed as $1,730.40, when it should have read $1,730.45. The above total reflects the accurate amount of disbursements for this fee period.

**Exhibit F**

MORGENSTERN JACOBS & BLUE, LLC
Peter D. Morgenstern (PM-5021)
Gregory A. Blue (GB-5569)
885 Third Avenue
New York, New York 10022
Tel: (212) 750-6776
Fax: (212) 486-0462

ATTORNEYS FOR THE OFFICIAL COMMITTEE
OF EQUITY SECURITY HOLDERS

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 Cases |
| | : | |
| ADELPHIA COMMUNICATIONS CORP. *et al.*, | : | Case No.: 02-41729 (REG) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

------------------------------------------------------------x

**Certification Under Guidelines for Fees and Disbursements for
Professionals in Respect of Application of
Morgenstern Jacobs & Blue, LLC for Interim Compensation
and Reimbursement of Expenses**

I, Peter D. Morgenstern, hereby certify that:

1.        I am an attorney at law, admitted to practice in the State of New York and

the United States Court for the Southern District of New York.  I am a member of the law

firm of Morgenstern, Jacobs & Blue, LLC ("MJB"), attorneys for the Official Committee

of Equity Security Holders (the "Equity Committee").  I am the professional designated

by MJB in respect of compliance with the Amended Guidelines for Fees and

1

Disbursements for Professionals in Southern District of New York Bankruptcy Cases adopted by the Court on June 20, 1991 (collectively, the "Local Guidelines") and the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 adopted on January 30, 1996 (the "UST Guidelines," together with the Local Guidelines, are the "Guidelines").

2. I make this certification in connection with MJB's application dated October 20, 2006 (the "Application") for interim compensation in the amount of **$2,047,395.00** and reimbursement of expenses in the amount of **$36,725.93** for the period beginning March 1, 2006 through and including August 31, 2006 (the "Compensation Period) in accordance with the Local Guidelines. The total award that MJB seeks in this Application for legal services rendered on behalf of the Equity Committee and reimbursement of expenses incurred in connection with the rendition of such services is **$2,084,120.93**.

3. In respect of section B.1 of the Local Guidelines, I certify that:

A. I have read the Application;

B. To the best of my knowledge, information and belief formed after reasonable inquiry, the fees and disbursements sought fall within the Guidelines;

C. Except to the extent that fees and disbursements are prohibited by the Guidelines, the fees and disbursements sought are billed at rates in accordance with practices customarily employed by MJB and generally accepted by MJB's clients; and

2

D. In providing a reimbursable service to the estates, MJB does not make a profit on that service, whether the service is performed by MJB in-house or through a third party.

4. In respect of section B.2 of the Local Guidelines, I certify that MJB has been providing, on a monthly basis, statements of MJB's fees and disbursements accrued during each month in accordance with the procedures approved by this Court in the Standing Order (as this term is defined in the Application).

5. In respect of section B.3 of the Local Guidelines, I certify that copies of the Application are being provided to: (a) the United States Trustee for the Southern District of New York; (b) the Debtors; (c) counsel to the Debtors; (d) counsel to the Administrative Agents for the Debtors' Prepetition Lenders; (e) counsel to the Administrative Agents for the Debtors' Postpetition Lenders; (f) counsel to the Official Committee of Unsecured Creditors; and (g) chairs of the official committees.

6. By this certification, MJB does not waive or release any rights or entitlements it has under the Orders of this Court, dated October 8, 2002 and October 24, 2003, approving, under section 328 of the Bankruptcy Code, MJB's retention by the Equity Committee.

7. MJB has not received any payment with respect to services rendered during the Compensation Period except for fees received pursuant to the Standing Order in the total sum of **$1,384,443.48,** representing eighty percent (80%) of MJB's fees during the Compensation Period, and **$34,995.48** representing one hundred percent (100%) of expenses billed. MJB now seeks payment of **$409,479.00** (the "Holdback Amount") for

3

legal services rendered during the Compensation Period not previously paid to MJB

pursuant to the Standing Order.[1]

      8.  There is no agreement or understanding between MJB and any other person or

entity, other than the members of MJB, for the sharing of compensation to be received for

services MJB renders in these cases.

Dated:  New York, New York
           October 24, 2006

                                                  /s/ Peter D. Morgenstern
                                              Peter D. Morgenstern

---

[1]      As more fully described in the accompanying Fee Application, the amounts listed reflect that to date, MJB has not received any payment in connection with its August 2006 Fee Application.

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Sara Wexler, on behalf of herself and all others similarly situated | United Air Lines, Inc. and UAL Corporation |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF 11001
**(EXCEPT IN U.S. PLAINTIFF CASES)**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Nat N. Polito, Esq. (D.C. Bar No 453365)
Law Offices of Nat N. Polito, PC 1776 K Street, N.W. Suite 200
Washington, D.C. 20006

ATTORNEYS (IF KNOWN)
Edward S. Scheideman (D.C. Bar No. 475128)
DLA Piper US LLP, 1200 Nineteenth Street, N.W.
Washington, D.C. 20036-2412

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question
(U. S. Government Not a Party)

☒ 4 Diversity
(Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

**☐ A.** *Antitrust*

☐ 410 Antitrust

**☐ B.** *Personal Injury/ Malpractice*

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**☐ C.** *Administrative Agency Review*

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**☐ D.** *Temporary Restraining Order/Preliminary Injunction*

Any nature of suit from any category may be selected for this category of case assignment.

* (If Antitrust, then A governs)*

## ☐ E. General Civil (Other) OR ☐ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

American LegalNet, Inc.
www.USCourtForms.com

| ☐ G. *Habeas Corpus/*<br>*2255* | ☐ H.*Employment*<br>*Discrimination* | ☐ I. *FOIA/PRIVACY*<br>*ACT* | ☐ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student<br>Loans (excluding veterans) |

| ☐ K. *Labor/ERISA*<br>*(non-employment)* | ☐ L. *Other Civil Rights*<br>*(non-employment)* | ☒ M. *Contract* | ☐ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☒ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting<br>Rights Act) |

---

**V. ORIGIN**

☐ 1 Original<br>Proceeding   ☒ 2 Removed<br>from State<br>Court   ☐ 3 Remanded from<br>Appellate Court   ☐ 4 Reinstated<br>or Reopened   ☐ 5 Transferred from<br>another district<br>(specify)   ☐ Multi district<br>Litigation   ☐ 7 Appeal to District<br>Judge from Mag.<br>Judge

---

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

28 U.S.C. §§ 1331, 1332, 1441, 1446, and 1453 – Removal of purported class action alleging breach of contract, fraud, negligent misrepresentation, unjust enrichment and
violation of the D.C. Consumer Protection Procedures Act.

| **VII.  REQUESTED IN**<br>**COMPLAINT** | CHECK IF THIS IS A CLASS<br>☒   ACTION UNDER F.R.C.P. 23 | **DEMAND** $75,001+ Check YES only if demanded in complaint<br>**JURY DEMAND:** ☒ YES   ☐ NO |
|---|---|---|

**VIII. RELATED CASE(S)**   (See instruction)   ☐ YES   ☒ NO   If yes, please complete related case form.
**IF ANY**

DATE   11/9/06   SIGNATURE OF ATTORNEY OF RECORD   *[signature]*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by
law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of
Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips
for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of
Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under
Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the
<u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the
category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's
Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

American LegalNet, Inc.<br>www.USCourtForms.com